**ERNST & YOUNG, Plaintiff, Appellant,**

v.

**DEPOSITORS ECONOMIC PROTECTION CORPORATION, et al., Defendants, Appellees.**

**No. 94–1749.**

United States Court of Appeals,
First Circuit.

Heard Nov. 7, 1994.

Decided Jan. 25, 1995.

Jerome G. Snider, with whom Daniel·F. Kolb, Davis Polk & Wardwell, New York City, Peter J. McGinn, John E. Bulman, Tillinghast, Collins & Graham, Providence, RI, Kathryn A. Oberly, and J. Andrew Heaton, Washington, DC, were on brief, for appellant.

Leonard Decof, with whom Howard B. Klein and Decof & Grimm, Providence, RI, were on brief, for appellees.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and CYR, Circuit Judge.

SELYA, Circuit Judge.

Plaintiff-appellant Ernst & Young (E & Y), an accounting firm, asked the United States District Court for the District of Rhode Island to strike down R.I.Gen.Laws § 42–116–40 (1993) (the Depco Act) on constitutional grounds. The district court dismissed the complaint because the controversy lacked ripeness, and, alternatively, because it invited abstention. E & Y appeals. We affirm.

## I. BACKGROUND

In January 1991, Bruce Sundlun, newly inaugurated Governor of Rhode Island, proclaimed a banking emergency precipitated by the collapse of the Rhode Island Share and Deposit Indemnity Corporation (RISDIC), a

firm that had insured deposits at no fewer than 45 Rhode Island-based financial institutions.[1] Since those institutions could not operate legally without deposit insurance, *see* R.I.Gen.Laws § 19–11–9, the Governor closed them.

The lockout provoked a financial crisis, preventing depositors from withdrawing their funds and causing consternation in a myriad of other ways. Over time, many of the affected institutions obtained insurance from sources such as the Federal Deposit Insurance Corporation, and resumed operations. Others were absorbed by insured entities. In the end ten financial institutions were unable to reopen. These financial institutions had something in common: each of them had followed uncommonly adventurous lending practices, and had become insolvent. They were all placed into conservatorship. The Rhode Island General Assembly created a public corporation, the Depositors Economic Protection Corporation (Depco), to act as the receiver, manage the failed banks' estates, marshal and liquidate their assets, repay depositors, and seek recovery from those responsible for the fiasco.[2] In addition, Depco served as the receiver for RISDIC.

A special state commission charged with investigating the banking crisis found no shortage of miscreants. The commission assigned blame, *inter alia*, to former officers and directors of the failed institutions, certain large borrowers, the state Department of Business Regulation, the General Assembly, and a former governor. The commission reserved some of its most stinging criticism for RISDIC and those persons who occupied prominent positions in the RISDIC hierarchy. The commission included E & Y, which had provided accounting services to RISDIC and to many of its insureds, as among the parties deserving special opprobrium.

The banks' collapse proved to be a depositor's nightmare but a lawyer's dream, spawning a plethora of lawsuits. For the most part, the depositors' and creditors' suits were consolidated in a series of master complaints (one for each failed institution) docketed in the state superior court. Then, in early 1992, Depco and other plaintiffs filed a civil action in superior court against E & Y and sundry other defendants. In that suit, the plaintiffs charged E & Y with negligence and professional malpractice. Among other things, they alleged that E & Y issued unqualified (or insufficiently qualified) audit opinions to RISDIC and a number of RISDIC-insured institutions despite obvious patterns of pervasive lending irregularities and other clear portents of impending financial disaster.

In July of 1993, the General Assembly revised state law as it pertained to the RISDIC cases by passing the Depco Act, Pub.L. 1993, ch. 85. The Act provides that potentially responsible parties who in good faith achieve judicially approved settlements with Depco will not be liable for contribution to other joint tortfeasors; and that, if a putative defendant settles with Depco on this basis, the potential liability of other joint tortfeasors will be reduced only by the dollar amount of the settlement, not by the settling party's pro rata share of the aggregate liability.[3]

---

1. The Rhode Island General Assembly chartered RISDIC in 1969 as a private deposit-insurance corporation. It began operations in 1971, subject only to state, not federal, regulation. Depositors tended to view RISDIC as a state-sponsored enterprise, and its proprietors—the banks and credit unions that dealt with it—did nothing to dispel this misconception.

2. As of the time the parties' briefs were filed, Depco had managed to repay 93% of the affected depositors and to repay 90% or more of the amounts owed to the remaining depositors.

3. The statute reads in relevant part:
   Notwithstanding any provisions of law to the contrary, a person, corporation, or other entity who has resolved its liability to the Rhode Island Depositors' Economic Protection Corporation, the receiver of Rhode Island Share and Deposit Indemnity Corporation or the receiver of any state-chartered financial institution in judicially-approved good faith settlement shall not be liable for claims for contribution or equitable indemnity regarding matters addressed in the settlement. Such settlement does not discharge any other tortfeasors unless its terms so provide, but it reduces the potential liability of such joint tortfeasors by the amount of the settlement.
   R.I.Gen.Laws § 42–116–40 (1993). The idea behind the statute is scarcely original; the Depco Act is modeled on the special contribution provisions contained in the Comprehensive Environmental Response Compensation & Liability Act

The Act transmogrifies the law of contribution for purposes of the RISDIC cases. Prior to its passage, a non-settling defendant in a negligence action—including a non-settling defendant in a RISDIC case—could, if found liable, seek contribution according to proportionate fault from all other joint tortfeasors, save only those who had entered settlements that explicitly released all claims against all potentially responsible parties for the settling tortfeasor's proportionate share of the overall liability. *See* R.I.Gen.Laws §§ 10–6–7, 10–6–8, 10–6–11 (1993). In other words, prior law ensured that, if a joint tortfeasor were held responsible for (and paid) more than its ratable share of damages, it could seek contribution from other joint tortfeasors who had carried less than their fair share of the load. Under the Depco Act, however, a non-settling tortfeasor can be held liable for more than its pro rata share of damages, yet find that it has no remaining right of contribution as to some (or, conceivably, all) of the coverage paid.

E & Y did not go quietly into this dark night. It promptly sued in the federal district court,[4] seeking a declaration that the Depco Act, on its face and as applied to E & Y, transgresses the Federal Constitution. Specifically, E & Y urged the court to find that the Act violates the due process and equal protection clauses, and that it constitutes an unlawful bill of attainder.

In its complaint, E & Y makes various allegations designed to highlight the ostensible unfairness of the legal predicament it now faces. Stripped of animadversions, the complaint brands the Depco Act as special legislation drafted for the specific purpose of depriving E & Y of preexisting substantive rights in order to intimidate E & Y and thereby force a lucrative settlement of Depco's negligence action.[5] Depco's strategy, E & Y alleges, is to reach early settlements with most potentially responsible parties, limited to the face value of their respective liability insurance policies, but to treat E & Y as a "deep pocket" from whom a huge settlement can be extracted. E & Y asserts that the doubts surrounding the viability of this strategy, and particularly the profound uncertainties about the Act's constitutionality, are currently imposing a substantial hardship on E & Y in at least two ways. First, the situation creates coercive pressure on E & Y to settle the pending state court suit. Second, it deprives E & Y of the ability adequately to appraise its potential exposure.

The defendants moved to dismiss the complaint for want of subject matter jurisdiction on the ground that the case lacked ripeness,[6] and, as a back-up, invoked several abstention theories. The district court referred the motion to a magistrate judge, *see* Fed.R.Civ.P. 72(b), who recommended that the complaint be dismissed for want of subject matter jurisdiction, or, alternatively, in the exercise of the court's discretion. E & Y objected to the magistrate's report. On *de novo* review, the district court characterized the complaint as unripe and dismissed it under Rule 12(b)(1). *See E & Y v. Depco*, 862 F.Supp. 709 (D.R.I. 1994). Judge Boyle stressed that since E & Y would only be damaged by the Depco Act if a series of contingent events occurred in the future, it failed satisfactorily to demonstrate that "it has sustained or is immediately in danger of sustaining a direct injury." *Id.* at 714–15. The judge went on to observe that, were the case ripe, comity and federalism concerns would nonetheless prompt him

---

(CERCLA), *see* 42 U.S.C. § 9613(f)(2)–(3) (1988); *see also United States v. Cannons Eng'g Corp.,* 899 F.2d 79, 91–92 (1st Cir.1990) (explaining operation of CERCLA contribution provisions).

**4.** E & Y's complaint named Governor Sundlun, Depco, and Depco's executive director as defendants. For simplicity's sake, we refer to the defendants, collectively, as "Depco."

**5.** E & Y adds various details designed to bolster this claim, including a charge that Depco's specially retained trial counsel lobbied for passage of the Act, telling legislators that changing the law of contribution greatly improved Depco's bargaining position vis-a-vis E & Y.

**6.** On appeal, Depco advances the closely related argument that E & Y lacks standing. Despite their natural imbrication, these asseverations are distinct; the standing doctrine is concerned with who may bring a particular suit, while the ripeness doctrine is concerned with when a party may bring suit. Because we hold that the controversy is not ripe, we eschew any consideration of whether E & Y also lacks standing.

to abstain.[7] *See id.* at 715–16 (citing *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)). This appeal ensued.

## II. STANDARDS OF REVIEW

■ A district court's determination that it lacks subject matter jurisdiction because the case before it is not ripe usually presents a question of law reviewable *de novo* in the court of appeals. *See Broughton Lumber Co. v. Columbia River Gorge Comm'n,* 975 F.2d 616, 618 (9th Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 60, 126 L.Ed.2d 30 (1993); *Shea v. Rev–Lyn Contracting Co.,* 868 F.2d 515, 517 (1st Cir.1989); *Felmeister v. Office of Atty. Ethics,* 856 F.2d 529, 535 n. 8 (3d Cir.1988). This case is no exception to the rule.

■ The standard of review that applies to a district court's discretionary decision to withhold a declaratory judgment is more problematic. Some courts afford plenary review, but others affirm unless the trial court's decision constitutes an abuse of discretion. *Compare, e.g., Allstate Ins. Co. v. Mercier,* 913 F.2d 273, 277 (6th Cir.1990) (utilizing plenary review) *and Gayle Mfg. Co. v. Federal Sav. & Loan Ins. Corp.,* 910 F.2d 574, 578 (9th Cir.1990) (same) *with, e.g., Christopher P. v. Marcus,* 915 F.2d 794, 802 (2d Cir.1990) (utilizing abuse of discretion standard), *cert. denied,* 498 U.S. 1123, 111 S.Ct. 1081, 112 L.Ed.2d 1186 (1991), *and Kunkel v. Continental Cas. Co.,* 866 F.2d 1269, 1273 (10th Cir.1989) (same). We have captured a middle ground, expressing our preference for a standard of independent review when passing upon a trial court's discretionary decision to eschew declaratory relief. This standard encourages the exercise of independent appellate judgment if it appears that a mistake has been made. *See El Dia, Inc. v. Hernandez Colon,* 963 F.2d 488, 492 (1st Cir.1992); *National R.R. Passenger Corp. v. Providence & Worcester R.R. Co.,* 798 F.2d 8, 10 (1st Cir.1986). Thus,

independent review invokes a standard more rigorous than abuse of discretion, but less open-ended than *de novo* review.

## III. THE DECLARATORY JUDGMENT ACT

■ The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 (1988), empowers a federal court to grant declaratory relief in a case of actual controversy. The Act does not itself confer subject matter jurisdiction, but, rather, makes available an added anodyne for disputes that come within the federal courts' jurisdiction on some other basis. *See Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 15–16, 103 S.Ct. 2841, 2849–50, 77 L.Ed.2d 420 (1983).

■ The Declaratory Judgment Act serves a valuable purpose.[8] It is designed to enable litigants to clarify legal rights and obligations before acting upon them. *See Step–Saver Data Sys., Inc. v. Wyse Tech.,* 912 F.2d 643, 649–50 (3d Cir.1990) (citing legislative history). Because the Act offers a window of opportunity, not a guarantee of access, the courts, not the litigants, ultimately must determine when declaratory judgments are appropriate and when they are not. Consequently, federal courts retain substantial discretion in deciding whether to grant declaratory relief. As we have stated, the Declaratory Judgment Act "neither imposes an unflagging duty upon the courts to decide declaratory judgment actions nor grants an entitlement to litigants to demand declaratory remedies." *El Dia,* 963 F.2d at 493; *accord Green v. Mansour,* 474 U.S. 64, 72, 106 S.Ct. 423, 427–28, 88 L.Ed.2d 371 (1985); *Public Serv. Comm'n v. Wycoff Co.,* 344 U.S. 237, 241, 73 S.Ct. 236, 239, 97 L.Ed. 291 (1952).

■ Not surprisingly, then, an indigenous jurisprudence has sprouted in the fields where the seeds of declaratory actions are sown. It is not necessary to harvest this jurisprudence today. For present purposes,

---

7. Judge Boyle also expressed his view that the Depco Act did not comprise a bill of attainder. *See E & Y,* 862 F.Supp. at 716–17. The court's statements on this score are gratuitous, and we express no opinion on them.

8. The Declaratory Judgment Act is mirrored by Fed.R.Civ.P. 57. The statute and the rule are functionally equivalent. *See, e.g., 118 E. 60th Owners, Inc. v. Bonner Props., Inc.,* 677 F.2d 200, 205 n. 8 (2d Cir.1982) (treating Rule 57 as implementing the remedy authorized by the Act).

it suffices to sound a note of caution: the discretion to grant declaratory relief is to be exercised with great circumspection when matters of public moment are involved, *see Washington Pub. Power Supply Sys. v. Pacific N.W. Power Co.*, 332 F.2d 87, 88 (9th Cir.1964), or when a request for relief threatens to drag a federal court prematurely into constitutional issues that are freighted with uncertainty, *see El Dia*, 963 F.2d at 494.

## IV. RIPENESS

In the first instance, the district court dismissed E & Y's action due to ripeness concerns. *See E & Y*, 862 F.Supp. at 713–15. E & Y assigns error. We discern none.

### A. *Examining The Ossature.*

In its seminal opinion on the application of the ripeness doctrine in the declaratory judgment context, the Supreme Court explained that the doctrine's basic rationale is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Labs v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). While the doctrine has a prudential flavor, a test for ripeness is also mandated by the constitutional requirement that federal jurisdiction extends only to actual cases or controversies, *see* U.S. Const. art. III, § 2; *see also Wycoff*, 344 U.S. at 242–45, 73 S.Ct. at 239–41. Consequently, although a court may, within stated limits, dismiss declaratory judgment actions in its discretion, a court has no alternative but to dismiss an unripe action.

■ Questions of ripeness that arise incident to challenged governmental actions in the declaratory judgment context are gauged by means of a two-part test. *See Abbott Labs*, 387 U.S. at 149, 87 S.Ct. at 1515–16. First, the court must consider whether the issue presented is fit for review. This branch of the test typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed. *See, e.g., W.R.*

*Grace & Co. v. EPA*, 959 F.2d 360, 364 (1st Cir.1992). The second branch of the *Abbott Labs* test requires the court to consider the extent to which hardship looms—an inquiry that typically "turns upon whether the challenged action creates a 'direct and immediate' dilemma for the parties." *Id.* (citation omitted).

■ The relationship between these two parts of the test—fitness and hardship—has never been precisely defined. Though some commentators have suggested that either of the two showings may suffice to allay ripeness concerns, *see, e.g.*, Laurence H. Tribe, *American Constitutional Law* § 3–10, at 80 (2d ed. 1987), the predominant weight of authority supports the opposite view, *see, e.g., Poe v. Ullman*, 367 U.S. 497, 509, 81 S.Ct. 1752, 1759, 6 L.Ed.2d 989 (1961) (dismissing for lack of ripeness despite the predominantly legal nature of the question presented and the minimal need for an extensive factual record); *Cedars–Sinai Medical Ctr., v. Watkins*, 11 F.3d 1573, 1581 (Fed.Cir.1993) (holding that a ripe case must meet both prongs of *Abbott Labs*); *see also* Erwin Chemerinsky, *Federal Jurisdiction* § 2.4, at 124 (2d ed. 1994) (deriving examples from Supreme Court jurisprudence). In line with the majority view, we hold that both prongs of the test ordinarily must be satisfied in order to establish ripeness. In so holding, however, we acknowledge the possibility that there may be some sort of sliding scale under which, say, a very powerful exhibition of immediate hardship might compensate for questionable fitness (such as a degree of imprecision in the factual circumstances surrounding the case), or vice versa.[9]

We end this segment of our opinion on yet another cautionary note. The ripeness inquiry is often *sui generis*. Most litigation has idiosyncratic features, and the various integers that enter into the ripeness equation play out quite differently from case to case, thus influencing the bottom line. *See, e.g., State of Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 693 (1st Cir.), *cert. de-*

---

9. We need not probe this final point, for E & Y has not made a sufficiently strong showing under either of the test's two prongs. *See infra* Part IV(C).

*nied,* —— U.S. ——, 115 S.Ct. 298, 130 L.Ed.2d 211 (1994).

## B. *Putting Flesh on the Bones.*

Before determining whether E & Y's initiative passes the *Abbott Labs* test, we pause to flesh out the test's two parts.

**1. *Fitness.*** We start with bedrock: "the critical question concerning fitness for review is whether the claim involves uncertain and contingent events that may not occur as anticipated or may not occur at all." *Massachusetts Ass'n of Afro–American Police, Inc. v. Boston Police Dep't,* 973 F.2d 18, 20 (1st Cir.1992) (per curiam); *accord Lincoln House, Inc. v. Dupre,* 903 F.2d 845, 847 (1st Cir.1990). This conclusion reflects an institutional awareness that the fitness requirement has a pragmatic aspect: issuing opinions based on speculative facts or a hypothetical record is an aleatory business, at best difficult and often impossible. *See, e.g., Calif. Bankers Ass'n v. Schultz,* 416 U.S. 21, 56, 94 S.Ct. 1494, 1515, 39 L.Ed.2d 812 (1974) ("This Court, in the absence of a concrete fact situation in which competing associational and governmental interests can be weighed, is simply not in a position to determine [the question presented].."); *Socialist Labor Party v. Gilligan,* 406 U.S. 583, 587, 92 S.Ct. 1716, 1718–19, 32 L.Ed.2d 317 (1972) (finding sole remaining issue unripe and dismissing appeal because the record lacks "the sort of proved or admitted facts that would enable [the Court] to adjudicate th[e] claim"). Nevertheless, the raw fact that events have not yet fully unfolded is not always fatal to justiciability. In such straitened circumstances, courts sometimes exhibit a greater willingness to decide cases that turn on legal issues not likely to be significantly affected by further factual development. *See, e.g., Pacific Gas & Elec. Co. v. State Energy Resources Conserv. & Dev. Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720–21, 75 L.Ed.2d 752 (1983) (finding fitness for judicial review supported by the "predominantly legal" nature of the question presented); *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 81–82, 98 S.Ct. 2620, 2634–35, 57 L.Ed.2d 595 (1978) (finding fitness for judicial review supported by the

fact that further factual development "would not ... significantly advance [the judiciary's] ability to deal with the legal issues presented nor aid ... in their resolution").

■ **2. *Hardship.*** The second half of the *Abbott Labs* inquiry focuses on the hardship that may be entailed in denying judicial review. In general, the greater the hardship, the more apt a court will be to find ripeness. *See, e.g., Pacific Gas,* 461 U.S. at 201 & n. 13, 103 S.Ct. at 1720–21 & n. 13. Though the hallmark of cognizable hardship is usually direct and immediate harm, other kinds of injuries occasionally may suffice. For example, if the operation of a challenged statute is inevitable, ripeness is not defeated by the existence of a time delay before the statute takes effect. *See Regional Rail Reorganization Act Cases,* 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974). And, moreover, even when the direct application of a statute is to some degree remote or contingent, its collateral effects may inflict present injuries that, though indirect, are adequate to support a finding of ripeness.

Thus, in *Duke Power,* the plaintiffs, some of whom resided near a nuclear power plant, sought a declaration as to the unconstitutionality of the Price–Anderson Act (which set a monetary cap on damages recoverable in consequence of nuclear accidents). Even though the Court thought the possibility of a nuclear accident speculative, it nonetheless found the controversy ripe. The Justices reasoned that the statute made feasible the construction of the plant, which, in turn, posed risks (such as fear of an accident, exposure to radiation, and thermal pollution) that would not otherwise exist. *See Duke Power,* 438 U.S. at 81, 98 S.Ct. at 2634–35. In the Court's view, these injuries were sufficient to support a finding of ripeness. *See id.* at 81–82, 98 S.Ct. at 2634–35; *see also McCoy–Elkhorn Coal Corp. v. EPA,* 622 F.2d 260, 263–65 (6th Cir.1980).

*Pacific Gas* illustrates that, in special circumstances, an injury sufficient to impute ripeness may also be found when a plaintiff must presently decide to expend substantial resources which may turn out to be wasted, depending on later clarification of the law. There, the Court determined that a group of

utilities could challenge a state law imposing a moratorium on the construction of nuclear power plants. *See Pacific Gas,* 461 U.S. at 197–200, 103 S.Ct. at 1718–20. Noting the long lead time and the millions of dollars that had to be expended simply to proceed to the licensing stage in the course of developing a nuclear power plant, *see id.* at 201 n. 13, 103 S.Ct. at 1721 n. 13, the Court envisioned enormous hardship were it to require the industry to chart a course of action without knowing whether the moratorium was valid.

Once again, we end with watchful words. A court's assessment of hardship need not be phrased solely in negative terms. The key question involves the usefulness of a declaratory judgment, that is, the extent to which the desired declaration "would be of practical assistance in setting the underlying controversy to rest." *Narragansett Tribe,* 19 F.3d at 693. Hence, courts should not become mired in the frequently sophistic distinction as to whether refusing declaratory relief will actually impose a hardship or merely fail to confer a benefit.

### C. *Applying the Test.*

Using *Abbott Labs* as the compass by which we must steer, we conclude, as did the district court, that E & Y's claims are unripe. First, the claims are not now fit for federal judicial review.[10] Second, postponing an adjudication will not work a substantial hardship.

■ **1. Fitness.** On the fitness prong, E & Y points to the fact that its complaint challenges the Depco Act both on its face and as applied. The former claim, it tells us, is quintessentially legal in nature, and, therefore, suitable for immediate judicial review. *See, e.g., Pacific Gas,* 461 U.S. at 201, 103 S.Ct. at 1720–21; *Duke Power,* 438 U.S. at

81–82, 98 S.Ct. at 2634–35. We believe that this is too simplistic a view, for it focuses narrowly on the claim's susceptibility to resolution and turns a blind eye to the related—but equally important—matter of whether judicial resolution is appropriate here and now.

■ The notion that disputes which turn on purely legal questions are always ripe for judicial review is a myth. Even when the "legal" emphasis of a particular claim is sufficient to mask gaps in the factual record, a court will find ripeness lacking if the anticipated events and injury are simply *too remote to justify contemporaneous adjudication.* *See Hodel v. Virginia Surface Mining & Reclam. Ass'n, Inc.,* 452 U.S. 264, 304, 101 S.Ct. 2352, 2374–75, 69 L.Ed.2d 1 (1981); *Lincoln House,* 903 F.2d at 847; *Benson v. Superior Court,* 663 F.2d 355, 360–61 (1st Cir.1981). Put bluntly, the question of fitness does not pivot solely on whether a court is capable of resolving a claim intelligently, but also involves an assessment of whether it is appropriate for the court to undertake the task. Federal courts cannot—and should not—spend their scarce resources in what amounts to shadow boxing. Thus, if a plaintiff's claim, though predominantly legal in character, depends upon future events that may never come to pass, or that may not occur in the form forecasted, then the claim is unripe. *See Mass. Ass'n of Afro-American Police,* 973 F.2d at 20; *Lincoln House,* 903 F.2d at 847; *see also Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941) (admonishing that a declaratory action is not ripe unless "the facts alleged, under all the circumstances, show that there is a substantial controversy ... of sufficient immediacy and reality"). For this reason, the mere fact

---

**10.** State judicial review is, however, in the offing. Shortly before we heard oral argument, Depco asked the state superior court to certify questions anent the constitutionality of the Depco Act to the state supreme court. Depco made the motion in a tort case it had commenced involving the collapse of the Brown University Employees Credit Union, a RISDIC-insured institution. Over E & Y's objection—E & Y is a third-party defendant in the suit—the superior court granted Depco's motion. The state supreme court received the certified questions, paired them with a strikingly similar set of constitutional issues limned by the Governor in a pending request for an advisory opinion, *see* R.I. Const. art. X, § 3 (authorizing the governor to request such advisory opinions from the state supreme court), and promulgated a consolidated briefing schedule. Although E & Y correctly maintains that announcing a briefing schedule is not tantamount to reaching the merits of the certified questions, it appears likely that the Rhode Island Supreme Court will soon hear oral arguments.

that E & Y asserts a challenge to the Depco Act on its face, without more, cannot carry the day.

Here, there is very little more: E & Y's claim lacks the needed dimensions of immediacy and reality. The challenge is not rooted in the present, but depends on a lengthy chain of speculation as to what the future has in store. Tracing the links in this chain demonstrates their fragility. In order for E & Y to be harmed by the operation of the statute, these events must come to pass: (1) at least one person, firm, or corporation other than E & Y must admit fault, or be found to have been at fault, and must have caused recoverable damages arising out of the banking crisis;[11] (2) that other party must settle with Depco; (3) the settlement must be entered into in good faith and approved by a competent court; (4) under the bargained terms, the settlor must pay less than its pro rata share, measured by relative fault; (5) perhaps most critically, E & Y—which, to this date, has steadfastly denied fault—must be found to have been negligent, and its negligence must be found to have caused or contributed to the damages; (6) Depco must attempt to collect an amount greater than E & Y's pro rata share of the damages; (7) a court must find E & Y liable for, and order it to pay, the tribute demanded; and (8) E & Y must then seek contribution from one or more of the "underpaying" joint tortfeasors (who, presumably, will interpose the statute as a defense). This is a long string of contingencies—so long that E & Y's assertion of fitness for judicial review trips over it and falls.

Courts should always be hesitant to answer hypothetical questions. See Poe, 367 U.S. at 503, 81 S.Ct. at 1755–56. That hesitancy does not evaporate merely because a suit is couched as a plea for declaratory relief. See, e.g., Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937) (explaining that courts, in the guise of declaratory judgment, should not issue opinions "advising what the law would be upon a hypothetical state of facts"). The manifold uncertainties that attend this case in its present posture bring to mind this principle: even though the legal question presented by E & Y's facial challenge to the Depco Act is not likely to be placed in sharper focus by further factual development, the claim is unripe because any application of the challenged statute to E & Y depends on serendipitous events that may not occur as anticipated—or may not occur at all. The case that E & Y argues is, at this stage, largely hypothetical, and such cases are seldom fit for federal judicial review. Cf. William Shakespeare, Macbeth, act I, sc. iii, ll. 133–34 (1605) (reminding readers that "present fears are [often] less than horrible imaginings").

This recital does not come close to exhausting E & Y's problems on the fitness prong of the Abbott Labs test. Over and beyond the potential waste of judicial resources that entertaining a remote and speculative claim would risk, there are other telltale signs that a finding of fitness is not warranted here. We mention two such indicators.

The first telltale has a prudential cast. Were we to permit E & Y's action to be decided now, we would be setting in motion a constitutional adjudication that not only could have a thunderous impact on important state interests but that might well prove to be completely unnecessary (if, say, E & Y were later found to have exercised due care, or if the parties settled for an amount that did not exceed E & Y's pro rata share of the recoverable damages). Courts should strive to avoid gratuitous journeys through forbidding constitutional terrain. See Poe, 367 U.S. at 502–04, 81 S.Ct. at 1755–56; see also El Dia, 963 F.2d at 494 (counselling that "[u]ncertain questions of constitutional law should be addressed only when absolutely necessary").

A second disincentive to a finding of fitness relates to the absence of other parties having a stake in the controversy. E & Y has sued

---

11. Depco apparently has reached one settlement that is expressly conditioned on the constitutionality of the Depco Act being upheld by the Rhode Island Supreme Court. See supra note 10. In the settlement papers the settling defendants disclaim any wrongdoing, and Depco agrees not to treat the fact of settlement as an admission of liability. The more widespread this pattern of settlement becomes, the more arduous it will be to fulfill the "other tortfeasor" requirement.

a state agency and two state officials. *See supra* note 4. While we do not doubt that these parties will defend the Act's constitutionality, E & Y's suit lacks full adverseness. *See generally Narragansett Tribe,* 19 F.3d at 692–93 (discussing adverseness requirement).[12] We explain briefly.

The real parties in interest are presumably the other joint tortfeasors (if any there be). After all, because tortfeasors are jointly and severally liable under Rhode Island law, Depco can collect the total amount of damages from E & Y regardless of what regime governs tortfeasors' rights of contribution. Thus, Depco's only interest in the Act relates to its efficacy as a negotiating tool.

It follows that, if E & Y is harmed at all, the parties most directly adverse to it will be underpaying tortfeasors—those who settle for less than their proportionate shares and who would, without the prophylaxis of the Depco Act, face liability to overpaying tortfeasors for contribution. These persons cannot be made parties to this litigation now because there is no way of predicting at this early date who they will be—or even if they will exist. Hence, E & Y's action, under current conditions, is incompletely adverse. This is a serious indictment, for a lawsuit that is hobbed in this manner is much less likely to be ripe for judicial review.[13] *See Connecticut Mut. Life Ins. Co. v. Moore,* 333 U.S. 541, 549–50, 68 S.Ct. 682, 687–88, 92 L.Ed. 863 (1948) (considering the absence of affected parties relevant to ripeness).

We think it is reasonably plain from what we have said that E & Y's claim, as it now stands, is not only incompletely adverse, but also remote, speculative, premature, and lacking in practical value. These factors, coupled with E & Y's desire to hurry the federal courts toward a tangled constitutional adjudication that may, in the end, prove to be inutile, render its suit inappropriate for immediate judicial review. Ergo, E & Y's challenge fails to satisfy the fitness prong of the *Abbott Labs* test.[14]

**2. Hardship.** By like token, we do not think that E & Y's case passes muster under the hardship prong of *Abbott Labs.* E & Y alleges that it is currently suffering two kinds of adverse effects from the Act, namely, increased pressure to settle Depco's suit and an inability to evaluate its exposure therein. These harms are indirect. And although it is true that present indirect effects occasionally may wreak a sufficient hardship to support a finding of ripeness, *see, e.g., Pacific Gas,* 461 U.S. at 201, 103 S.Ct. at 1720–21, the effects of which E & Y complains are not so pernicious. There is quite a difference between increasing the risk of exposure to radiation, *Duke Power,* 438 U.S. at 81–82, 98 S.Ct. at 2634–35, and increasing the difficulty of evaluating a money damages claim for settlement purposes.

The uncertainty of which E & Y complains in this case arises in the context of bilateral negotiations, not yet under way, in which opposing parties will explore the possibility of settling a hotly disputed case based partly on the expected results of the litigation.

---

12. E & Y touts *Narragansett Tribe,* a case in which we found disputed issues ripe, as directly applicable precedent. We do not agree. There, unlike in this case, the state's suit fully satisfied the adverseness requirement. *See Narragansett Tribe,* 19 F.3d at 692–93. Other distinctions abound; the arguably unripe issues in that case were not of constitutional stature, the public interest favored immediate adjudication, comity was not a problem (as, there, unlike here, the state urged the federal court to proceed), the hardship that would flow from non-adjudication was starkly apparent, and the utility of a prompt decision was more easily discernible.

13. The absence of affected parties also has implications for the hardship *vel non* of denying review, *see infra* Part IV(C)(2). Even if E & Y were to prevail in the instant action, it seems likely that settling joint tortfeasors, not parties here, would be entitled to relitigate the Depco Act's constitutionality in defending subsequent contribution actions brought by E & Y. *See NLRB v. Donna–Lee Sportswear Co.,* 836 F.2d 31, 33–34 (1st Cir.1987) (explaining requirements for collateral estoppel); *E.W. Audet & Sons, Inc. v. Fireman's Fund Ins. Co.,* 635 A.2d 1181, 1186–87 (R.I.1994) (similar; elucidating Rhode Island law).

14. We have discussed only E & Y's challenge to the constitutionality of the Depco Act on its face. To go further would be supererogatory. Because the facial challenge is unfit for review, it follows *a fortiori* that the "as applied" challenge to a freshly minted statute that has yet to make its maiden voyage is also unfit.

That situation presents a type of hardship that is qualitatively different than those displayed in *Pacific Gas* and *Duke Power,* for resolving the challenge to the Depco Act will help the challenger only marginally. Either way, E & Y still will be faced with the incubus of pending litigation. Either way, E & Y still will have to make an evaluative judgment anent the desirability of settlement on various terms—a judgment that depends on many factors other than its right to contribution (and, accordingly, on many factors that will not be clarified by an immediate determination of the statute's constitutionality). The usefulness that may satisfy the hardship prong of *Abbott Labs* is not met by a party showing that it has the opportunity to move from a position of utter confusion to one of mere befuddlement.

This is not to deny that a declaratory decree might have some utility. If the declaratory action proceeds to a conclusion, the parties will obtain an additional piece of information that will help them to determine a settlement strategy. The point, however, is that E & Y—though it will be better informed—still will not be spared the need to make the very sort of evaluative judgment that it tells us it is striving to avoid. What is more, E & Y still will not control its own destiny in respect to settlement, for Depco might (or might not) be willing to settle on E & Y's terms, and other tortfeasors might (or might not) leave themselves open to contribution claims, regardless of whether the declaratory judgment action proceeds.

The limited utility of the judgment that E & Y seeks here is highlighted by the fact that the "value" of a case for settlement purposes is always a moving target. Phrased another way, settlement value is at best an estimate, subjective in nature, reflecting the worth that the parties themselves, for myriad reasons, attach to their case. *See Mathewson Corp. v. Allied Ma-*

*rine Indus., Inc.,* 827 F.2d 850, 855 (1st Cir.1987). It follows inexorably that the settlement value of Depco's claim against E & Y will not be determined by the incidence of rights of contribution alone. *See generally* Note, *Private Settlement as Alternative Adjudication: A Rationale for Negotiation Ethics,* 18 U.Mich.J.L.Ref. 503, 515 n. 16 (1985) (explaining that one cannot "presum[e] that projected *legal* rights are the principal determinants of negotiated agreements.... [O]ther considerations incident to bargaining power, such as relative financial strength and eagerness to avoid trial, are often vitally important to both the process and ultimate content of private settlements"). Because settlement evaluations typically "are the product of intangible criteria which defy quantification," *Mathewson,* 827 F.2d at 855, the present uncertainty will only be lessened somewhat, not avoided, should the action proceed.[15]

Of course, a litigant's plaints of hardship cannot be assessed in a vacuum. Rather, a claim of hardship demands an assessment of the complainant's position in light of all the attendant circumstances. *See State Farm Mut. Auto. Ins. Co. v. Dole,* 802 F.2d 474, 479 (D.C.Cir.1986) (noting that application of *Abbott Labs* is not "a matter of weaving complicated legal distinctions divorced from reality," but, rather, requires the exercise of "practical common sense") (internal quotation marks omitted), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987); *cf. Narragansett Tribe,* 19 F.3d at 692–93 (explaining that the inquiry into adverseness likewise requires an assessment of all the attendant circumstances). Here, three facts soften the sharp edges of E & Y's professed hardship, and, therefore, counsel restraint.

First, the contingent nature of E & Y's claim has implications for hardship as well for fitness. Given the stretched chain of

---

15. It perhaps bears noting that the lack of certitude both helps and hurts E & Y. On one hand, the uncertainty admittedly generates pressure on E & Y to pay more by way of settlement. But on the other hand, the uncertainty also encourages Depco to settle for less than it would demand if it knew beyond any peradventure of doubt that the Act would withstand constitutional scrutiny. By the same token, a resolution of the constitutional question would cut both ways. If a court upholds the Depco Act, E & Y probably will be faced with the prospect of paying more for a release, whereas, if a court invalidates the Act, E & Y probably will be able to pay less. This shifting array of possibilities, tilting first in one direction and then in the other, further dilutes E & Y's claim of an intolerable hardship.

events that must transpire before the Act can harm E & Y, and the speculative nature of many of those events, we remain unconvinced either that E & Y's ability to negotiate is unfairly handicapped or that its ability to settle will be substantially enhanced by an immediate decision about the constitutionality of the Act. Second, E & Y is not without other options. Proceedings are underway in the state court that offer a vehicle for the expedited constitutional adjudication that E & Y seeks, unaccompanied by the disadvantages that deter us in this case. *See supra* note 10. E & Y is already a party to the underlying state-court litigation and can, if it chooses to do so, participate in the proceedings before the Rhode Island Supreme Court. Finally, as some other defendants reportedly have done, E & Y can enter into negotiations with Depco aimed at fashioning a settlement that is contingent on an adjudication of the Act's constitutionality. *See supra* note 11.

In sum, the Depco Act does not work a sufficient hardship, gauged by present effects, to justify a finding of ripeness. Though E & Y may feel some discomfiture over the threatened impairment of its anticipated right to contribution, the burden of which it complains is for the most part indigenous to the litigation process, and, thus, it cannot be made weightless by the desired declaratory relief.

## V. CONCLUSION

We need go no further.[16] E & Y yearns for the blossom when only the bud is ready. Because its challenge to the constitutionality of the Depco Act satisfies neither the fitness nor the hardship prong of the *Abbott Labs* test, it is not yet ripe for federal judicial review. Accordingly, the district court's dismissal of E & Y's complaint for lack of subject matter jurisdiction must be

*Affirmed.*

---

16. Although lack of ripeness is dispositive here, we do not in any way suggest that the lower court's alternate ground for dismissal—abstention—lacks force. In particular, to the extent that the court's abstention ruling rests on the discretion provided by the Declaratory Judgment Act, *see, e.g., El Dia*, 963 F.2d at 493–95, it appears fully sustainable. As we have indicated, the constitutional questions presented by a challenge to the Depco Act are of great import to Rhode Island, and lie at the core of the massive litigation that is proceeding glacially in its court system. Even if no individual abstention doctrine requires federal courts to forgo review—a matter on which we do not opine—the comity and federalism concerns that animate the various doctrines strongly suggest that dismissal of E & Y's declaratory action mirrors the course of prudence.