CERTAIN UNDERWRITERS AT LLOYD'S, LONDON And Other Companies, subscribing to the insurance policies represented by Certificate Nos. CN55985/81, CN55986/81, HT9503, HT9504, HT9505, HU9503, HU9504, HU9505, HW9503, HW9504, HW9505, C58/3963, C58/3972, UJL0169, UKL0640, Plaintiffs–Appellants,

v.

ST. JOE MINERALS CORPORATION; Renco Group, Inc.; Doe Run Resources Corporation; D.R. Acquisition Corp., Defendants–Appellees.

No. 1011, Docket 95–7729.

United States Court of Appeals, Second Circuit.

Argued Feb. 29, 1996.

Decided July 26, 1996.

Terry M. Cosgrove, Chicago, IL (Regina K. McCabe, Peterson & Ross, Chicago, IL, of counsel), for Plaintiffs–Appellants.

David L. Mulliken, San Diego, CA (Michael W. Ellison, Leigh A. White, Latham & Watkins, Costa Mesa, CA, of counsel), for Defendants–Appellees.

Before: VAN GRAAFEILAND, MESKILL and WINTER, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Certain Underwriters at Lloyd's, London and other companies subscribing to specified Lloyd's insurance policies (the "London Market Insurers" or "plaintiffs") appeal from a judgment of the United States District Court for the Northern District of New York (McAvoy, J.). The judgment dismissed plaintiffs' declaratory judgment action against St. Joe Minerals Corporation, formerly known as St. Joseph Lead Company, and its successors in interest, Renco Group, Inc., D.R. Acquisition Corporation, and Doe Run Resources Corporation (collectively "St. Joe"). For the reasons that follow, we affirm.

St. Joe has conducted lead and zinc mining and mineral smelting operations at various sites throughout the United States since the late 19th Century. As a result of alleged toxic contamination at a number of these locations, St. Joe has been named a Potentially Responsible Party ("PRP") pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 et seq., and numerous claims have been made and actions brought against it. St. Joe had liability insurance coverage with Zurich Insurance Company from December 31, 1959 to February 4, 1969 and again from March 15, 1971 to February 4, 1985. Because of uncertainties concerning both coverage and liability, Zurich, on July 27, 1992, sued St. Joe in the United States District Court for the Eastern District of Missouri seeking a declaratory judgment as to its status.

On October 5, 1992, St. Joe instituted a similar declaratory judgment action in Orange County Superior Court of California. However, in this action, St. Joe named as defendants not only its primary insurers, Zurich and Insurance Company of North America, but also its excess carriers, including the London Market Insurers. The insurers then moved to stay the California action in deference to the Missouri action. After extensive briefing in both the California and Missouri courts over which action should have precedence, the California court denied the motion to stay, and the Missouri court dismissed the action before it in deference to the more complete suit in California.

On March 14, 1994, several of St. Joe's excess insurers filed a demurrer seeking dismissal of the California action for lack of ripeness. They argued that the underlying primary coverage had not been exhausted and there was no evidence that their coverage was likely to be impacted. The court agreed and dismissed the action as to them without prejudice for lack of ripeness. Apparently influenced by this decision, St. Joe informed the London Market Insurers on May 9, 1994 that with court approval it was dismissing them from the action without prejudice to reinstatement should subsequent events make reinstatement appropriate.

Three months later, the London Market Insurers brought the instant action in the United States District Court for the Northern District of New York seeking a determination of their obligations under the same policies that were at issue in the California action. Each of these policies provided excess liability insurance which was triggered after the exhaustion of specified primary liability insurance. The policy periods and attachment points are described in the London Market Insurers' brief as follows:

| Certificate/ Policy Number | Policy Period | Attachment Point |
|---|---|---|
| C58–3972 | August 1, 1958–August 1, 1961 | $ 25,000.00 |
| C58–3963 | August 1, 1958–August 1, 1961 | $ 125,000.00 |
| UJL–0169 | February 14, 1977–February 4, 1978 | $ 10,100,000 |
| UKL–0640 | February 4, 1978–February 4, 1979 | $ 10,300,000 |
| CN–55985/81 | February 4, 1981–February 4, 1982 | $ 5,500,000 |
| CN–55986/81 | February 4, 1981–February 4, 1982 | $ 5,500,000 |
| HT–9503 | June 1, 1983–June 1, 1984 | $ 2,000,000 |
| HT–9504 | June 1, 1983–June 1, 1984 | $ 27,000,000 |
| HT–9505 | June 1, 1983–June 1, 1984 | $ 52,000,000 |
| HU–9503 | June 1, 1984–June 1, 1985 | $ 2,000,000 |
| HU–9504 | June 1, 1984–June 1, 1985 | $ 27,000,000 |

| Certificate/<br>Policy Number | Policy Period | Attachment<br>Point |
|---|---|---|
| HU–9505 | June 1, 1984–June 1, 1985 | $ 52,000,000 |
| HW–9503 | June 1, 1985–June 1, 1986 | $ 7,000,000 |
| HW–9504 | June 1, 1985–June 1, 1986 | $ 32,000,000 |
| HW–9505 | June 1, 1985–June 1, 1986 | $ 57,000,000 |

The London Market Insurers alleged that St. Joe faced liability at twenty contaminated sites: Avanti, Indianapolis, IN; Balmat–Edwards, Gouverneur, NY; Bartlesville, OK; Big River Mine Tailings, Desloge, MO; Bunker Hill, Kellogg, ID; Cherokee County, KS; Colorado School of Mines, Golden, CO; Energy Research Corp., Danbury, CT; NL Industries, Granite City, IL; Harbor Island, WA; Ilada Energy Co., Clinton County, IL; Jasper County, MO; Leadwood Mine Tailings, MO; Metcoa, Pulaski, PA; Missouri Electric Works, Cape Girardeau, MO; Monaca, PA; Tar Creek, Ottowa County, OK; Port of Pascagoula, MS; Stringfellow Acid Pits, Glen Avon, CA; and Tonolli Corp., Carbon County, PA. However, they produced little evidence to demonstrate the likely magnitude of St. Joe's liability at these sites.

For eleven of the sites, the London Market Insurers showed only that St. Joe had been named as a PRP by the Environmental Protection Agency ("EPA"). Moreover, they did not produce even an EPA estimate of the total clean-up costs for these sites, and the district court was left without any guide as to the extent or likelihood of St. Joe's potential liability. At four other sites at which the EPA named St. Joe as a PRP, the London Market Insurers' principal evidence was an EPA report containing its estimates of the total remedial costs: Bunker Hill, $40.6 million; Cherokee County, $13.6 million; Missouri Electric Works, $9.1 million; and Tar Creek, $4 million. St. Joe responded with evidence showing an unlikelihood that its liability would even approach the estimated $67.3 million in remedial costs for these sites.

With respect to Bunker Hill, St. Joe asserted that it was only a supplier of pure ore; it did not perform any smelting operations or waste disposal at the site. St. Joe took the position that CERCLA does not impose liability for the supplying of a smelting facility with pure ore. *See* 42 U.S.C. § 9607(a). *See also Douglas County v. Gould, Inc.*, 871

F.Supp. 1242, 1245 (D.Neb.1994). Moreover, St. Joe was only one of sixteen suppliers that had been identified by the EPA as PRPs. The EPA was also considering naming additional PRPs, including some upstream mining companies and owner/operators.

St. Joe, through its since-dissolved subsidiary, Kansas Explorations, conducted lead and zinc mining operations at Cherokee County from 1924 to 1941, and at Tar Creek from 1926 to 1947. However, St. Joe is not the only named PRP at either site. Moreover, in March 1994, St. Joe took the position in an extensive brief submitted to the EPA that it could not be held liable, because the relevant activity was conducted entirely by a dissolved subsidiary.

■ Courts are of two views on the question of a parent corporation's liability under CERCLA for the actions of its subsidiary. In the Fifth Circuit, and until recently in the Sixth Circuit, a parent corporation is not held liable unless it is shown to have such total control over its subsidiary that traditional veil-piercing would be appropriate. *See Joslyn Mfg. Co. v. T.L. James & Co.*, 893 F.2d 80, 82–83 (5th Cir.1990), *cert. denied*, 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 1098 (1991); *United States v. Cordova Chem. Co.*, 59 F.3d 584, 590–91 (6th Cir.), *reh'g en banc granted and judgment vacated*, 67 F.3d 586 (6th Cir.1995). Other Courts of Appeals hold that CERCLA may impose a broader liability upon both "owners" and "operators." These courts find the parent liable on an "owner" theory when veil piercing would be appropriate, but also allow liability on an "operator" theory with a showing of lesser control. *See, e.g., United States v. USX Corp.*, 68 F.3d 811 (3d Cir.1995); *United States v. TIC Inv. Corp.*, 68 F.3d 1082 (8th Cir.1995); *Jacksonville Elec. Auth. v. Bernuth Corp.*, 996 F.2d 1107 (11th Cir.1993);

*United States v. Carolina Transformer Co.,* 978 F.2d 832 (4th Cir.1992); *United States v. Kayser–Roth Corp.,* 910 F.2d 24 (1st Cir. 1990), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991). At the time of the district court's decision in the instant case, we had not yet taken a position on this issue. However, in *Schiavone v. Pearce,* 79 F.3d 248 (2d Cir.1996), we joined the majority of circuits in holding that a parent corporation can be held liable as an operator under CERCLA even if the elements for veil-piercing are not established.

■ Nonetheless, St. Joe's defense remains substantial even after *Schiavone.* Although we decided that a parent can be held liable without veil-piercing, we have yet to decide what degree of control will be required. *See id.* at 254 n. 5. We need not decide this question today. Suffice it to say that more is required than simple ownership and the general authority or control that comes with it. At a minimum there must be "active involvement in the activities of the subsidiary." *Kayser–Roth, supra,* 910 F.2d at 27. *See also Lansford–Coaldale Joint Water Auth. v. Tonolli Corp.,* 4 F.3d 1209, 1220–22 (3d Cir.1993). Although the Fourth Circuit has found mere authority to control sufficient, *see Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 842 (4th Cir.), *cert. denied sub. nom. Mumaw v. Nurad, Inc.,* 506 U.S. 940, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992), it is debatable whether this Court is prepared to go that far. Moreover, evidence is lacking that St. Joe was actively involved in the activities of Kansas Explorations. In addition, at both the Cherokee County and Tar Creek sites, St. Joe is only one of several named PRPs, and at both sites, all the relevant conduct appears to have taken place before the 1950's, making uncertain the coverage of the London Market policies the earliest of which was written in 1958.

In connection with the Missouri Electric Works site, the London Market Insurers cited a $9.1 million EPA estimate of the cleanup costs. The land where Missouri Electric operated was contaminated by leaking transformer oil. St. Joe was named as a PRP because it had sent transformers to Missouri Electric for service since the mid–1950's. St.

Joe, however, was only one of over 170 PRPs named at the time of suit. Given that any liability St. Joe faces will be spread out over almost 40 years of activity, it is unlikely that such liability will even come close to the lowest attachment point in any given year.

Plaintiffs' only allegation with respect to the Balmat, Bartlesville, and Monaca sites was that there was "at least one lawsuit pending against St. Joe by another PRP, Horsehead Industries, Inc., seeking, among other things, up to $10 million in contribution for response costs and attorneys fees already incurred with respect to the Bartlesville, Oklahoma, site, as well as indemnification for environmental claims, losses and damages with respect to the Balmat, New York, and Monaca, Pennsylvania, sites." However, other than the $10 million dollar figure named in the prayer for relief, plaintiffs presented no evidence that Horsehead was likely to recover anything close to this amount.

Moreover, St. Joe began mining at the Balmat site in 1926. Any liability it may face in connection with this site will have to be apportioned over the 61 year period between 1926 and 1987 when St. Joe sold the Balmat site to Horsehead; Plaintiffs provided coverage for only nine of those years. In addition, St. Joe did not acquire the Bartlesville site until December 30, 1983, when it entered into a stock purchase agreement with Phibro–Salomon, Inc. and Phibro Resources Corporation. The lowest attachment point during this period is $2 million. When the fact that St. Joe is seeking contribution from other parties is taken into account, the impact of the *Horsehead* litigation on the Lloyd's policies is far from clear.

Indeed, the record as a whole consists in large measure of speculation. Uncertainty surrounds St. Joe's liability. It has viable defenses, there are numerous other PRPs to share the unestablished remedial costs, and the challenged activity is spread out over a substantial time period, during much of which plaintiffs' policies were not in existence.

On October 21, 1994, St. Joe moved to dismiss the instant action on three grounds: (1) that the action was not ripe, (2) that Lloyd's had not adequately pled diversity jurisdiction, and (3) that the federal court

should abstain in deference to the California action. On December 23, 1994, the district court granted St. Joe's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), holding that declaratory action was not yet ripe. The court stated that, although the total clean-up cost for the contaminated sites was high, there was no practical likelihood that St. Joe's liability would reach the layers of its excess insurance when there were many other PRPs and St. Joe had viable defenses to liability. The court did not reach St. Joe's other two arguments for dismissal.

The plaintiffs then moved for reconsideration pursuant to Fed.R.Civ.P. 59(b) and. 60(b). In support of their motion, they sought to introduce evidence as to the attachment points of two additional excess insurance policies. The court refused to receive the proffered evidence because "there [was] no reason why plaintiffs could not have provided the information at an earlier stage." *Certain Underwriters at Lloyd's, London v. St. Joe Minerals Corp.*, 889 F.Supp. 65, 67 (N.D.N.Y.1995). This was not an abuse of discretion. *See Thomas v. SS Santa Mercedes*, 572 F.2d 1331, 1336 (9th Cir.1978); *Angco v. Standard Oil Co. of California*, 66 F.2d 929, 930 (9th Cir.1933). *See also Music Research, Inc. v. Vanguard Recording Soc'y, Inc.*, 547 F.2d 192, 196 (2d Cir.1976).

The district court also validly rejected plaintiffs' argument that the court erred in considering the existence of other PRPs at the contaminated sites. The court held that "[t]his information clearly plays a part in whether triggering the excess liability policies is a mere possibility or a 'practical likelihood.'" 889 F.Supp. at 68.

█ It is by now traditional law that "'[t]he judicial power does not extend to ... abstract questions.'" *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 242, 73 S.Ct. 236, 239, 97 L.Ed. 291 (1952) (quoting *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 324, 56 S.Ct. 466, 472, 80 L.Ed. 688 (1936)). It follows that, in the absence of an "actual controversy," a district court is without power to grant declaratory relief. *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 272, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941); *Maryland Casualty Co. v. Rosen*, 445 F.2d 1012, 1014 (2d Cir.1971).

At first blush, the existence *vel non* of an actual controversy would not appear to lend itself to discretionary disposition. Either there is an actual controversy or there is not. If there is not, there is no discretionary action that a court can take. *See Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 597 (2d Cir.1996); *Muller v. Olin Mathieson Chem. Corp.*, 404 F.2d 501, 505 (2d Cir.1968); *Ernst & Young v. Depositors Economic Protection Corp.*, 45 F.3d 530, 534–35 (1st Cir.1995). However, the problem of justiciability is not solved that simply. "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy." *Maryland Casualty Co. v. Pacific Coal & Oil Co., supra*, 312 U.S. at 273, 61 S.Ct. at 512. *See Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir.), *cert. denied*, 501 U.S. 1218, 111 S.Ct. 2829, 115 L.Ed.2d 998 (1991). This may explain, at least in part, why in declaratory judgment cases, this Court generally has assumed the right to substitute its judgment for that of the trial court. *See, e.g., In re Joint Eastern and Southern District Asbestos Litig.*, 993 F.2d 313, 314 (2d Cir.1993); *Continental Casualty Co. v. Coastal Sav. Bank*, 977 F.2d 734, 736 (2d Cir.1992); *Maryland Casualty Co. v. Rosen, supra*, 445 F.2d at 1014.

The continued vitality of these cases has been put in doubt by the Supreme Court's decision in *Wilton v. Seven Falls Co.*, ——— U.S. ———, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). However, because our conclusion coincides with that of the district court, we need not concern ourselves with the standard of review. *In re Combustion Equip. Assocs., Inc.*, 838 F.2d 35, 37 (2d Cir.1988). We are not dissuaded from taking this position by the fact that both counsel and the district court cited Rule 12(b)(6) rather than Rule 12(b)(1) as the procedural pathway they followed. Justiciability and jurisdiction are not synonymous terms. *See Flast v. Cohen*, 392 U.S. 83, 94–97, 88 S.Ct. 1942, 1949–51, 20 L.Ed.2d 947 (1968); *International Soc'y for Krishna Consciousness v. Eaves*, 601 F.2d 809, 817 (5th Cir.1979). There is no question but that both the district court and counsel

clearly understood that the issue of justiciability was a decisive issue in the case. Assuming that Rule 12(b)(1) would have been a preferable citation, we may consider the matter as if it was cited. *See St. Clair v. City of Chico,* 880 F.2d 199, 201 (9th Cir.), *cert. denied,* 493 U.S. 993, 110 S.Ct. 541, 107 L.Ed.2d 539 (1989); *Biotics Research Corp. v. Heckler,* 710 F.2d 1375, 1379 (9th Cir. 1983).

■ We have reviewed the record carefully, limiting our review to the evidence that was before the district court. *See Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 857 n. 19, 102 S.Ct. 2182, 2190 n. 19, 72 L.Ed.2d 606 (1982). We agree with the district court's conclusion that "the case alleged [is] not currently a justiciable and ripe controversy," 889 F.Supp. at 66, and we hold that dismissal of the complaint without prejudice is the correct disposition of the action. This leaves open the possibility that at some future time a more complete development of the facts might lead to a different result. Should such development lead to further litigation, the district court then can resolve the issues of jurisdiction and abstention.

The judgment of the district court is affirmed.