# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**NORMAN T. FUNK**
**LIBBY GOODKNIGHT**
Krieg DeVault, LLP
Indianapolis, Indiana

**ROBERT E. HEIDORN**
**JOSHUA A. CLAYBOURN**
Vectren Corporation
Evansville, Indiana

**CLAYTON C. MILLER**
Bamberger Foreman Oswald & Hahn, LLP
Indianapolis, Indiana

**JEROME POLK**
Polk & Associates, LLP
Indianapolis, Indiana

**TODD A. RICHARDSON**
**JOSEPH P. ROMPALA**
Lewis & Kappes, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**A. DAVID STIPPLER**
**RANDALL C. HELMEN**
Indiana Office of Utility Consumer Counselor
Indianapolis, Indiana

**LARRY J. WALLACE**
**JAMES A. L. BUDDENBAUM**
**TRAVIS W. MONTGOMERY**
Parr Richey Obremskey Frandsen & Patterson
Indianapolis, Indiana

**KARL L. MULVANEY**
**MICHAEL R. LIMRICK**
**DAVID T. McGIMPSEY**
Bingham Greenebaum Doll, LLP
Indianapolis, Indiana

**MARK W. COOPER**
Indianapolis, Indiana

**JEFFERSON A. LINDSEY**
Rockport, Indiana

**FILED**

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

INDIANA GAS COMPANY, INC. and ) 
SOUTHERN INDIANA GAS AND )
ELECTRIC COMPANY, *et al.*, )
 )
    Appellants-Respondents, )
 )
        vs. )    No. 93A02-1112-EX-1141
 )
INDIANA FINANCE AUTHORITY and )
INDIANA GASIFICATION, LLC, )
 )
    Appellees-Petitioners. )

APPEAL FROM THE INDIANA UTILITY REGULATORY COMMISSION
The Honorable James D. Atterholt, Chairman
Cause No. 43976

**October 30, 2012**

**OPINION - FOR PUBLICATION**

**RILEY, Judge**


STATEMENT OF THE CASE

Appellants-Respondents, Indiana Gas Company, Inc. and Southern Indiana Gas and Electric Company, both d/b/a Vectren Energy Delivery of Indiana, Inc. (collectively, Vectren); Ohio Valley Gas Corporation; Ohio Valley Gas, Inc.; Sycamore Gas Company; Arcelor Millal USA; Haynes International, Inc.; Rochester Metal Products Corporation; Vertellus Specialties, Inc.; Countrymark Refining & Logistics, LLC; Corn Products International, Inc.; Citizens Action Coalition; Spencer County Citizens for Quality of Life; Valley Watch, Inc., and the Sierra Club appeal the Indiana Utility Regulatory Commission's (the Commission) judgment in favor of Appellees-Petitioners, the Indiana Finance Authority (IFA); Indiana Gasification, LLC (IG); Lincolnland Economic Development Corp. (Lincolnland), and the Indiana Office of Utility Consumer Counselor (OUCC) with respect to the Commission's approval of a Substitute Natural Gas Purchase and Sale Agreement (Contract) between the IFA and IG.[1]

---

[1] Citizens Gas & Coke Utility; Citizens Gas of Westfield; Community Natural Gas Company, Inc.; Midwest Natural Gas Corporation; Indiana Natural Gas Corporation; Eli Lilly & Company; United States

2

We reverse.

## ISSUES

Arcelor Millal USA; Haynes International, Inc.; Rochester Metal Products Corporation; Vertellus Specialties, Inc.; Countrymark Refining & Logistics, LLC; and Corn Products International, Inc. (collectively, the Industrial Group)[2] raise two issues on appeal, which we consolidate and restate as the following single issue: Whether the Commission erred in approving the Contract when the Contract defined "retail end use customer" in a manner contrary to the statutory definition of the same term.

Vectren; Ohio Valley Gas Corporation; Ohio Valley Gas, Inc.; and Sycamore Gas Company (collectively, the Utilities); and Citizens Action Coalition of Indiana, Inc.; Spencer County Citizens for Quality of Life; Valley Watch, Inc.; and the Sierra Club (collectively, the Citizens Groups) raise two additional issues on appeal, which we consolidate and restate as the following single issue: Whether the Commission exceeded its jurisdiction when it approved the Contract.

As a separate issue, the IFA, IG, and Lincolnland present us with the following issue, which we restate: Whether the Utilities and the Industrial Group have standing to appeal the Commission's approval of the Contract.

## FACTS AND PROCEDURAL HISTORY

Steel Corporation; Northern Indiana Public Service Company; Kokomo Gas & Fuel Company; and Northern Indiana Fuel & Light Company, Inc. have also been parties to these proceedings. However, they have not filed separate briefs on appeal.

[2] Eli Lilly & Company and the United States Steel Corporation were members of the Industrial Group during the Commission proceedings, but are not members of the group on appeal.

Substitute natural gas (SNG) is a pipeline quality gas produced from coal through a manufacturing process called coal gasification. It serves as an alternative to natural gas and is used to fuel gas appliances in many Indiana homes and businesses. In 2009, the Indiana General Assembly expressed approval of SNG production in Public Law 2-2009, which has since been codified as the Substitute Natural Gas Act (the SNG Act) in Ind. Code § 4-4-11.6. In the SNG Act, the General Assembly included its findings that: "[t]he furnishing of reliable supplies of reasonably priced natural gas for sales to retail customers is essential for the well being of the people of Indiana;" and "[o]btaining low cost financing for the construction of new coal gasification facilities is necessary to allow retail end use customers to enjoy the benefits of a reliable, reasonably priced, and long term energy supply." I.C. § 4-4-11.6-12. In accordance with these findings, the SNG Act outlines procedures governing the production, purchase, and sale of SNG. It authorizes the IFA to enter into contracts for the purchase, transportation, and delivery of SNG, and allows the IFA to establish rates and charges to retail end use customers for the SNG.

On March 26, 2009, two days after the Governor signed Public Law 2-2009, the IFA issued a request for proposals (RFP) in which it solicited coal gasification project proposals from suppliers of SNG. IG sent its response to the RFP on April 9, 2009 and was the only entity that responded. Leucadia National Corporation (Leucadia), a New York-based developer in the coal gasification business, incorporated IG as a limited

4

liability, special purpose entity for the sole purpose of developing a coal gasification facility (the Plant) near Rockport, Indiana.

IG's proposed plan was to build, own, and operate the Plant, which it estimated would cost $2.7 billion to develop. IG expected to receive $800 million of the amount needed, which was equivalent to 30% of the total estimated cost, in the form of private capital from Leucadia. IG also expected to receive a federal loan guarantee from the United States Department of Energy (DOE) for the remaining $1.875 billion. Depending upon its financing, legal proceedings, and environmental permitting requirements, IG planned to commence construction of the Plant in the third quarter of 2012 and to begin delivering SNG in the first quarter of 2016.

On January 14, 2011, the IFA and IG executed the Contract, which details the sale and purchase of the SNG that IG plans to produce at the Plant. The Contract provides that the IFA will buy up to a fixed annual amount of 38 million MMBTUs[3] of SNG from IG for a period of 30 years, to be measured from the day SNG production at the Plant begins. In exchange, the IFA will pay IG a base amount, adjusted to account for new taxes, changes in governmental requirements, net incremental revenues, and net $CO_2$ revenues. The base amount will be calculated by adding: (1) the sum of a fixed capital cost of $3.50 per MMBTU; (2) certain operation and maintenance expenses; (3) the actual cost of fuel used by IG, adjusted for various factors; and (4) the cost of transporting the SNG to the IFA.

---

[3] An MMBTU is the equivalent of one dekatherm (dth).

The Contract also specifies that once the IFA has bought the SNG from IG, it will sell the SNG on the open natural gas market for either a profit or loss, which will then be passed along to the ratepayers of Indiana regulated gas utilities who are classified by I.C. § 4-4-11.6-10 as "retail end use customers." If the price of the SNG exceeds the market price of natural gas, the IFA will sell the SNG at a loss and will pass 100% of the difference to the retail end use customers in the form of charges on their monthly gas bills. If the price of SNG is lower than the market price of natural gas, IG and the retail end use customers will each receive 50% of the profits.

In order to mitigate the charges to the retail end use customers, IG specified in the Contract that it will set up a $150 million "Consumer Protection Reserve Account." When the IFA sells SNG at a loss, it will first take the difference from this Reserve Account rather than pass along the cost to the retail end use customers. The IFA will only pass along charges to the retail end use customers once the Reserve has been depleted. Likewise, when the IFA sells the SNG for a profit, it will replenish the Reserve before it passes along any net savings to retail end use customers.

As required by I.C. § 4-4-11.6-7, which specifies that a contract for the purchase of SNG must provide a guarantee of savings for retail end use customers, IG guarantees $100 million of savings to retail end use customers, measured in 2008 dollars. Under the Contract, there are three ways in which retail end use customers may realize these savings other than through the sale of the SNG on the natural gas market. First, if customers have not realized the savings by the end of the 30-year term, IG may cover the

shortfall in cash. Second, the IFA may extend the Contract by up to an additional twenty years. During this extension, the IFA may purchase the SNG from IG at lower prices in the hopes of making up the shortfall. Third, the IFA may force a sale of the Plant in order to make up for the difference. If it appears in year twenty-five of the Contract that the Plant will not be worth $100 million at the end of the thirty years, the IFA may receive a reduction in the price of SNG beginning in year twenty-six.

On December 16, 2010, the IFA and IG filed a joint petition with the Commission seeking approval of the Contract and requesting that the Commission order Indiana regulated gas utilities to enter into utility management agreements (UMAs) with the IFA so that the IFA could pass proceeds and costs to retail end use customers through the utilities, if necessary. Pursuant to I.C. § 8-1-1.1-4.1 and the SNG Act, the OUCC appeared as a party in this proceeding on behalf of ratepayers, consumers, and the public.[4] On January 3, 2011, Vectren filed a petition to become either a named respondent or an intervenor in the proceedings. On January 24, 2011, the Commission entered a docket entry naming Vectren as a respondent. That same day, the IFA and IG filed an amended petition identifying all of the Indiana regulated gas utilities as respondents.

On January 26, 2011, Lincolnland and the Industrial Group, then comprised of Arcelor Mittal USA, Eli Lilly & Company, and the United States Steel Corporation, filed petitions to intervene. On January 27, 2011, Citizens Gas & Coke Utility, Citizens Gas

---

[4] Pursuant to the SNG Act, the IFA is required to consult with the OUCC before negotiating or entering into a purchase contract for SNG.

of Westfield, and six regulated local distribution companies[5]—Community Natural Gas Company, Inc.; Midwest Natural Gas Corporation; Indiana Natural Gas Corporation; Ohio Valley Gas Corporation; Ohio Valley Gas, Inc.; and Sycamore Gas Company (the Six LDCs)—appeared in the matter. On February 2, 2011, the Citizens Groups filed a joint petition to intervene. On February 10, 2011, by a docket entry, the Commission granted Lincolnland and the Industrial Group's petitions to intervene. Finally, on February 17, 2011, the Commission granted the Citizens Groups' joint petition to intervene.

On April 18, 20, and 25, 2011, the Commission held public field hearings throughout the state in order to solicit public comments on the Contract and the proposed Plant. Subsequently, the Commission received written testimony and exhibits submitted by the parties, and then on May 2, 4, 5, 6, 12, and 13, 2011, the Commission held an evidentiary hearing at which it heard live testimony.

Two of the most significant disputes between the parties at the hearing were whether the Contract provides a guarantee of savings for retail end use customers and whether the Contract definition of "retail end use customer" conflicts with its statutory definition. Vectren presented evidence that, during the 30-year term, the cost of the Contract to Indiana's retail end use customers might total between 1.7 and 4 billion dollars, as measured in 2008 dollars. The IFA and IG, in turn, claimed that the Contract

---

[5] Local distribution companies (LDCs) are local gas utilities that serve the public pursuant to public utility laws and that are under the regulation of the Commission. "LDCs" and "gas utilities" are synonymous.

will likely provide savings of $500 million and is guaranteed to provide savings of at least $100 million.

On November 22, 2011, following the hearing, the Commission approved the Contract. In its order, the Commission did not address the scope of the term "retail end use customer," but instead suggested that the issue could be discussed in non-adjudicative "technical conferences," whereby the parties could resolve how the gas utilities should collect funds from retail end use customers. Alternatively, the Commission found that the IFA could file a separately docketed proceeding to address the issue in the event that the parties could not reach an agreement on the definition of "retail end use customer."

On December 12, 2011, the Industrial Group filed a petition for reconsideration, asking the Commission to find that industrial transportation customers were exempt from being classified as retail end use customers under the statute and, therefore, did not have to pay the pass-through costs of the SNG under the Contract. On December 21, 2011, Vectren filed a notice of appeal, and the next day the Industrial Group, Citizens Groups, and three members of the Six LDCs—the three members that, along with Vectren, constitute "the Utilities"—filed their own notices of appeal. The parties subsequently filed a complex series of motions, the end result of which was that the Commission again declined to make a finding on the definition of "retail end use customer." Instead, the Commission reiterated that it would address disputes over the term in a "separately docketed proceeding," should such a proceeding be filed, but that the issue was not ripe

for consideration until that time. On March 22, 2012, Vectren filed an amended notice of appeal to include the Commission's order.

The Utilities, the Citizens Groups, and the Industrial Group now appeal. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

## JUSTICIABILITY

Because the IFA, IG, and Lincolnland present us with a threshold procedural matter in their appellee's brief, we will first address whether the Industrial Group and the Utilities' claims are justiciable. The IFA, IG and Lincolnland argue that they are not because 1) the issues are not ripe; 2) the Industrial Group and the Utilities do not have standing because they have not proven that they will suffer adverse effects as a result of the Contract; and 3) the Industrial Group is not an entity that has a right to appeal because it is "an ad hoc collection of industrial transportation customers whose 'membership' has changed over the course of these proceedings." (Appellee's Br. p. 23).[6] We will address each of these issues separately.

### A. *Ripeness*

The basic rationale behind our ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial

---

[6] While the OUCC is also an Appellee, it filed a separate brief, which we will hereafter designate as "the OUCC's Br."

10

interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998). A claim is not ripe for adjudication if it rests upon "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. U.S.,* 523 U.S. 296, 300 (1998). In addition to preventing this court from prematurely entangling itself in an abstract agreement, "there is also a 'usually unspoken' underlying rationale [for ripeness] relating to the doctrine of mootness: a claim may be unripe where 'if we do not decide [the claim] now, we may never need to.'" *Alcoa Power Generating, Inc. v. Fed. Energy Reg. Comm'n,* 643 F.3d 963, 967 (D.C. Cir. 2011) (quoting *Devia v. Nuclear Reg. Comm'n,* 492 F.3d 421, 424 (D.C. Cir. 2007)).

When reviewing a ripeness challenge, we consider the fitness of the issues for judicial decision and the hardship caused to the parties by withholding court consideration. *Hardy v. Hardy*, 963 N.E.2d 470, 474 n.3 (Ind. 2012). With respect to the "fitness" prong of this standard, we may consider whether the issue is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final. *Alcoa Power Generating, Inc.,* 643 F.3d at 967. With respect to the "hardship" prong, we will find there to be hardship when a delay would cause an immediate and significant change in a party's conduct of its affairs with serious penalties attached for noncompliance. *Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 743 (1997).

1. *The Industrial Group*

11

The Industrial Group is a group of industrial transportation customers who purchase natural gas in the competitive interstate market and rely on gas utilities only for local transportation services. The Group claims that the Contract will subject transportation customers to charges under the UMAs, whereas the Legislature did not intend to include transportation customers within the definition of "retail end use customers" who may be charged pursuant to the SNG Act. The Contract specifies that the term "retail end use customer" has the meaning "set forth in [I.C. §] 4-4-11.6-10; *provided that*, for the absence of doubt, 'retail end use customer' means all Indiana customers of each applicable local gas distribution company except for industrial transport customers with an annual volume level of 50,000 dekatherms or greater." (Industrial Group's App. p. 384). In contrast, section 4-4-11.6-10 of the SNG Act defines "retail end use customer" as

> a customer who acquires energy at retail for the customer's own consumption:
> (1) from a gas utility that must apply to the [C]omission under [I.C. §] 8-1-2-42 for approval of gas cost changes; or
> (2) under a program approved by the [C]omission through which the customer purchases gas that would be subject to price adjustments under [I.C. §] 8-1-2-42 if the gas were sold by a gas utility.

I.C. § 4-4-11.6-10. The Industrial Group points to the difference between these two definitions as evidence that the Commission exceeded its jurisdiction in approving the Contract because the Contract will allow the IFA to pass-through charges to transportation customers with an annual volume of less than 50,000 dekatherms.

Addressing the fitness component of a ripeness claim, we first focus on the legality and the "concrete" setting of the particular issue brought before us. With respect to the legality of the issue, we note that questions of statutory interpretation fall within the exclusive province of the judiciary and are the responsibility of the court. *MicroVote General Corp. v. Ind. Election Comm'n,* 924 N.E.2d 184, 201 (Ind. Ct. App. 2010). Because we must interpret the SNG Act to review whether the Contract's definition conforms with the Legislature's intent, the question before us is purely legal. Further, because the issue is not dependent on factual circumstances, our determination will not benefit from a "more concrete setting." *See Alcoa Power Generating Inc.,* 643 F.3d at 967. The IFA, IG and Lincolnland argue that there are still factual contingencies because the future negotiation of the UMAs will clarify the issue. However, the Industrial Group's claim is not that the terms of the UMAs will cause transportation customers to receive excessive charges; rather, the Group's argument is that transportation customers should not be subject to the UMAs at all. Awaiting the clarification of the terms of the future UMAs will therefore not benefit our analysis.

It would only benefit us to delay our review if the establishment of the UMAs in general were speculative. This is because the issue of whether the Industrial Group is subject to the UMAs would become irrelevant if the IFA were to decide not to establish any UMAs at all. However, it is clear under the terms of the Contract that the establishment of the UMAs is inevitable.

Article XIV of the Contract provides:

13

> [The IFA] covenants and agrees that [the IFA] will not take or permit any action or fail to take or permit any action that would . . . otherwise limit, alter, or impair the ability of [the IFA] to satisfy its contractual obligations hereunder, including the establishment and collection of the price of SNG from retail end use customers, in each case, until this [Contract] has been terminated. [The IFA] further acknowledges and agrees that any action, omission, or failure to act by the State or any agency thereof to cause [the IFA] not to establish a sufficient revenue requirement, or not to collect rates or to pay [IG] in each case would constitute a breach of this [Contract].

(Industrial Group's App. p. 359). Pursuant to this provision, the IFA may not fail to take any action that would limit its ability to collect the price of SNG from retail end use customers without breaching the Contract. Thus, we conclude that the establishment of the UMAs is unavoidable.

Turning to the hardship prong of the ripeness challenge, we note a split in the federal circuits concerning whether the "fitness" and "hardship" test constitutes a two-part test or two independent bases for ripeness.[7] This is an issue of first impression in Indiana.

We decline to go so far as to declare that a petitioner need not satisfy the hardship prong of the test. Instead, we choose to follow the majority of circuits who hold that both prongs of the test must be satisfied at least to a minimal degree. This approach balances the concerns of the court in judicial economy and the concerns of the parties in avoiding hardship or undue litigation. As in some circuits, we interpret this test as a "sliding scale" in which "a very powerful exhibition of immediate hardship might compensate for

---

[7] For more information and a list of cases in favor of either alternative, see *South Dakota v. Mineta,* 278 F.Supp. 1025, 1028 (D.S.D. 2003).

questionable fitness, [] or vice versa." *Ernst & Young v. Depositors Economic Protection Corp.,* 45 F.3d 530, 535 (1st Cir. 1995).

Hardship can be established where a delay would cause an immediate and significant change in a party's conduct of its affairs with serious penalties attached to noncompliance. *Suitum,* 520 U.S. at 743. [Al]though the hallmark of cognizable hardship is usually direct and immediate harm, other kinds of injuries may occasionally suffice." *Ernst & Young,* 45 F.3d at 536. If the operation of a challenged statute is inevitable, ripeness is not defeated by the existence of a time delay before the statute takes effect. *Id.*

Here, the Industrial Group will suffer direct harm if it is subject to pass-through charges and we deem that those charges are unauthorized under the SNG Act. However, it is questionable whether this impact will be "immediate" because charges will first be paid out of the $150 million Consumer Protection Reserve Account. Nevertheless, we conclude that the Industrial Group's claim is ripe for our review. The First Circuit Court of Appeals has held that ripeness is not defeated by the existence of a time delay when the operation of a statute is inevitable, and we conclude that the same principle holds when the operation of a contract is inevitable and there are no contingent factual issues. *See id.* This interpretation is in harmony with our determination that "fitness" and "hardship" should operate on a sliding scale. As there is great evidence of "fitness" in the instant case and at least minimal evidence of hardship, we balance any remaining question of hardship in favor of ripeness.

15

## 2. *The Utilities*

Turning to the Utilities, we note that their challenge to the Commission's jurisdiction has two components. First, they assert that the Contract is not final, which is a prerequisite for Commission review under I.C. § 4-4-11.6-13, and second, they argue that the Contract does not satisfy the SNG Act's requirement that any SNG purchase contract must provide guaranteed savings for retail end use customers. *See* I.C. § 4-4-11.6-7. The IFA, IG, and Lincolnland do not address ripeness within the context of the Utilities' contract claim, but argue that the Utilities' guaranteed savings claim is "a UMA issue, not an SNG Contract issue." (Appellee's Br. p. 23).

In regards to the finality of the Contract, we have held that the interpretation of a contract is a legal issue. *Battershell v. Prestwick Sales, Inc.,* 585 N.E.2d 1, 4-5 (Ind. Ct. App. 1992), *trans. denied.* It is also significant that the interpretation of the finality of the Contract here is not dependent on any contingent factual issues and will not be more "concrete" at a later date if we delay our review. Accordingly, we conclude that the issue is judicially fit for review.

Hardship is somewhat more difficult to establish as none of the parties have addressed the issue of ripeness within the context of the Utilities' contract claim. However, it is clear here that the Contract is integral to the construction of the 2.7 billion dollar Plant, IG's attainment of a federal loan guarantee from the DOE, and the IFA's negotiation of the underlying UMAs. A delay in reviewing the finality of the Contract would possibly have enormous repercussions. Although most Circuit courts have

16

recognized that the burden of participating in further administrative hearings and judicial proceedings does not constitute sufficient hardship, some courts have nevertheless acknowledged an exception where delaying resolution would inhibit or delay investment. In *Alcoa Power Generating, Inc.,* the District of Columbia Circuit Court of Appeals analyzed the Federal Regulation and Development of Power Act and found that because the statute set the hydroelectric project license term at not less than 30 nor more than 50 years, Congress had recognized that significant capital investments in hydro power could not be made without the certainty and security of a multi-decade license. *Alcoa Power Generating Inc.,* 643 F.3d at 970. As a result, the D.C. Circuit Court held that it would be a hardship for a power generating company to endure a delay in its application for a new 50-year license. *Id.*

Similarly, our General Assembly acknowledged in the SNG Act that "[l]ong term contracts for the purchase of SNG between the [IFA] and SNG producers will enhance the receipt of federal incentives for the development, construction, and financing of new coal gasification facilities in Indiana." I.C. § 4-4-11.6-12. Towards that end, the General Assembly provided that an SNG purchase contract must have a thirty year term. I.C. § 4-4-11.6-12. It is clear from these provisions that the General Assembly recognized the importance of investment in SNG development and would consider a delay in our review of the finality of a purchase contract a hindrance to such investments. As such, we will consider the issue.

Turning to the second component of the Utilities' claim, that the Contract does not provide the requisite guarantee of savings to retail end use customers, we reject the IFA and IG's argument that this is a UMA issue rather than a purchase contract issue. It is clear that the SNG Act considers purchase contracts and UMAs as being independent of each other. I.C. § 4-4-11.6-22 provides that the IFA may request the Commission to order gas utilities to enter into UMAs with the IFA, and I.C. § 4-4-11.6-14 provides that the IFA may enter into purchase contracts with SNG producers and submit those contracts to the Commission for approval. By addressing these two forms of contracts in separate provisions, the Legislature has clarified that although a purchase contract and its corresponding UMAs are related, they are nevertheless independent.

Thus, because they are independent, we conclude that the parties to a purchase contract must provide a guarantee of savings for retail end use customers in that purchase contract, not its corresponding UMAs. The definitions listed in the SNG Act support our interpretation. Pursuant to I.C. § 4-4-11.6-7, a *purchase contract* is a contract that "provides a guarantee of savings for retail end use customers." (emphasis added). In contrast, § 4-4-11.6-22, which governs the establishment of UMAs, does not mention savings for retail end use customers. In light of this construction, and because the parties have already negotiated and received approval for the Contract, we find that the issue of whether the Contract has provided an adequate guarantee is ripe for our review.

With respect to hardship, this claim relates to whether the Commission had jurisdiction to approve the Contract. As a result, there might be a significant hardship

with respect to investments if we delay our review. Accordingly, we conclude that both of the Utilities' arguments are ripe for review.

## B. *Standing*

Having found that the claims at issue are ripe for appeal, we will now address whether the Industrial Group and the Utilities have standing to bring those claims. Standing is a fundamental, threshold, constitutional issue that must be addressed by this, or any, court to determine if it should exercise jurisdiction in the particular case before it. *Alexander v. PSB Lending Corp.,* 800 N.E.2d 984, 989 (Ind. Ct. App. 2003), *trans. denied.* The issue of standing focuses on whether the complaining party is the proper party to invoke the court's power. *Midwest Psychological Center, Inc. v. Ind. Dept. of Admin.,* 959 N.E.2d 896, 902-03 (Ind. Ct. App. 2011), *trans. denied.* Under our general rule of standing, only those persons who have a personal stake in the outcome of the litigation and who show that they have suffered or are in immediate danger of suffering a direct injury as a result of the complained-of conduct will be found to have standing. *Id.* at 903.

Our General Assembly has codified Indiana's common law standing requirement with respect to judicial review of Commission orders in I.C. § 8-1-3-1, which states that "[a]ny person, firm, association, corporation, limited liability company, city, town, or public utility *adversely affected* by any final decision, ruling, or order of the [Commission] may . . . appeal to the court of appeals of Indiana [] under the same terms and conditions as govern appeals in ordinary civil actions" (emphasis added). The IFA,

IG, and Lincolnland argue that neither the Utilities nor the Industrial Group has standing because neither party has proven that it has or will be adversely affected by the Commission's order.

Our standard for "adversely affected" under I.C. § 8-1-3-1 is similar to the "hardship" standard for ripeness. A party is "adversely affected" when it has sustained or is in immediate danger of sustaining a direct injury as a result of an order. *Home Builder's Ass'n of Ind., Inc. v. Ind. Utility Reg. Comm'n,* 544 N.E.2d 181, 184 (Ind. Ct. App. 1989). In their reply brief, the Utilities make two arguments with respect to the Contract's adverse effect: (1) an increase in gas bills caused by the Contract will impact the Utilities' ability to competitively retain customers; and (2) the Contract will impact the Utilities' ability to add new customers vis-à-vis alternative forms of energy such as propane, geothermal, and electric, and thereby spread their fixed costs across a larger customer base.

We have found that the imposition of the UMAs is inevitable. In light of this finding, it is clear that the Utilities will be bound to use SNG and will not, as they allege, have the freedom to choose from among alternative forms of energy. We conclude that this consequence is sufficiently adverse to satisfy the requirements of I.C. § 8-1-3-1.

Likewise, as we stated above, the Industrial Group is in danger of sustaining a direct injury as a result of the Contract. The Industrial Group will suffer direct harm if it is subject to pass-through charges and if we find that those charges are not authorized

under the SNG Act. As a result, we conclude that the Industrial Group is adversely affected by the Commission's order and has standing to appeal.

## C. *Right to Appeal*

The IFA, IG, and Lincolnland's final challenge with respect to justiciability is that the Industrial Group is not an entity that has a statutory right to appeal the Commission's order. I.C. § 8-1-3-1 provides that "[a]ny person, firm, association, corporation, limited liability company, city, town, or public utility . . . may . . . appeal to the court of appeals of Indiana." The IFA, IG, and Lincolnland note that the Industrial Group is an "an ad hoc collection of industrial transportation customers whose 'membership' has changed over the course of these proceedings." (Appellee's Br. p. 23).

In *United States Gypsum, Inc. v. Indiana Gas Co., Inc.,* 735 N.E.2d 790, 793-94 (Ind. 2000), our supreme court described the evolution of industrial transportation customers such as the entities that comprise the Industrial Group. It explained:

> Historically, LDCs purchased both gas and transportation of that gas as a single "bundled" product from interstate pipelines. Beginning in 1978, Congress and the Federal Energy Regulatory Commission [] took steps to stimulate competition, leading interstate pipelines to offer transportation as a separate service. This created a competitive market for the gas itself and allowed customers to sell or "release" pipeline capacity that they did not need. With these changes emerged interstate marketers who sell gas to LDCs and large volume consumers. These large volume consumers are known as transportation customers because they buy gas directly from the marketer but rely on LDCs to provide local, intrastate pipeline transportation.

*Id.* The Industrial Group here is comprised of such transportation customers— customers who rely on LDCs for local, intrastate pipeline transportation.

21

On January 26, 2011, when the Industrial Group filed its original petition to intervene, it was comprised of Arcelor Mittal USA, Eli Lilly & Company, and the United States Steel Corporation. On December 12, 2011, it filed an amendment to Appendix A of its petition to reflect the withdrawal of Eli Lilly & Company and the United States Steel Corporation. On December 21, 2011, it filed a second amendment to Appendix A to reflect the addition of Haynes International, Inc., Rochester Metal Products Corporation, and Vertellus Specialties, Inc. Finally, on January 18, 2012, the Industrial Group filed a third amendment to Appendix A to reflect the addition of Countrymark Refining & Logistics, LLC and Corn Products International, Inc. The IFA and IG admit that the Industrial Group most closely resembles an association, but point to the Industrial Group's amendments to Appendix A as evidence that it is merely "a collection of whomever wants to participate in this case at any given time," rather than an association. (Appellee's Br. p. 24).

The IFA and IG made the same argument before the Commission, and it was rejected when the Commission noted that at least one member had remained in the group from the start of the proceedings until the present. We agree and also find that the Industrial Group has the qualities of an association. The IFA, IG, and Lincolnland cite *Hanson* for the premise that an association is "formed by mutual consent for the purpose of promoting a common enterprise or prosecuting a common objective." *Hanson v. United Methodist Church,* 704 N.E.2d 1020, 1022 n.5 (Ind. 1998). As the Industrial Group asserts, at all points during the proceedings, its members have been industrial

22

transportation customers that purchase natural gas in the competitive interstate market and rely on gas utilities only for local transportation services. Also at all points, its members have shared the common objective of ensuring that they are not charged fees under the Contract as retail end use customers. Accordingly, we conclude that the Industrial Group is an association and has standing under I.C. § 8-1-3-1.

APPEAL

I. *Jurisdiction*

Next, we address the jurisdictional issue raised by the Utilities and the Citizens Groups: whether the Commission exceeded its jurisdiction under the SNG Act when it approved the Contract. The SNG Act provides that the IFA "shall submit a final purchase contract to the [C]omission for approval." I.C. § 4-4-11.6-14(b). The Act defines a "purchase contract" as "a contract that: (1) is entered into by the [IFA] and a producer of SNG for the sale and purchase of SNG; (2) has a thirty (30) year term; (3) provides a guarantee of savings for retail end use customers; and (4) contains other terms and conditions determined necessary by the [IFA]." I.C. § 4-4-11.6-7. Citing I.C. § 4-4-11.6-14(b) and the Act's definition of "purchase contract," the Utilities and the Citizens Groups argue that the Commission exceeded its jurisdiction in approving the Contract because the Contract omits essential terms, is not final, and is not a valid purchase contract.

An agency action is always subject to review as contrary to law. *U.S. Steel Corp. v. Northern Ind. Pub. Serv. Co.,* 951 N.E.2d 542, 551 (Ind. Ct. App. 2011), *trans. denied.*

23

An agency's decision is contrary to law when that agency fails to stay within its jurisdiction and to abide by the statutory and legal principles that guide it. *Citizens Action Coalition of Ind., Inc. v. Northern Ind. Pub. Serv. Co.,* 485 N.E.2d 610, 613 (Ind. 1985), *cert. denied,* 476 U.S. 1137 (1986). The Commission, as an administrative agency, "derives its power and authority solely from the statute, and unless a grant of power and authority can be found in the statute, it must be concluded that there is none." *Ind. Bell Tel. Co., Inc. v. Ind. Util. Reg. Comm'n,* 715 N.E.2d 351, 354 n.3 (Ind. 1999). This court owes no deference to the Commission's interpretation of statutes that restrict its regulatory jurisdiction and reviews such legal decisions *de novo. U.S. Steel Corp.,* 951 N.E.2d at 551. Any doubt about the existence of the Commission's authority must be resolved against a finding of such authority, and any act by the Commission in excess of its statutory power is *ultra vires* and void. *Planned Parenthood of Ind. v. Carter,* 854 N.E.2d 853, 864 (Ind. Ct. App. 2006).

The first step in any statutory interpretation is determining if the Legislature has spoken clearly and unambiguously on the point in question. If a statute is clear and unambiguous on its face, no room exists for judicial construction. *Thatcher v. City of Kokomo,* 962 N.E.2d 1224, 1227 (Ind. 2012). However, when the language is susceptible to more than one interpretation, it is deemed ambiguous and thus open to judicial interpretation. *Id.* When construing a statute, the Legislature's definition of individual words is binding upon us. *Ind. Patient's Compensation Fund v. Wolfe,* 735 N.E.2d 1187, 1191 (Ind. Ct. App. 2000), *trans. denied.* If the Legislature has not defined a word used

24

in a statute, the word will be given its "plain, ordinary, and usual meaning." *Planned Parenthood of Ind.,* 854 N.E.2d at 866. Every word must be given effect and meaning, and no part of the statute should be held meaningless if it can be reconciled with the rest of the statute. *Lex, Inc. v. Bd. of Trustees of Town of Paragon,* 808 N.E.2d 104, 109 (Ind. Ct. App. 2004), *trans. denied.*

The SNG Act provides that the IFA must submit a final purchase contract to the Commission for approval. I.C. § 4-4-11.6-14(b). On its face, this provision is clear and unambiguous—it grants the Commission the authority to approve a final purchase contract. Significantly, though, this is the only provision in the SNG Act where the Legislature has granted the Commission authority to approve a contract for the purchase of SNG. We conclude therefore that, because an agency only has authority where expressly granted, the Commission does not have authority to approve a contract that is not a final purchase contract as defined in the statute. *See Ind. Bell Tel. Co., Inc.,* 715 N.E.2d at 354 n.3.

The Utilities and the Citizens Groups make three arguments against the validity of the Contract as a final purchase contract. First, they argue that the Contract does not fulfill the common law requirements for an enforceable contract because it is missing essential terms. Due to these same "missing" terms, as well as unexecuted related agreements, they also argue that the Contract is not final. Lastly, they argue that the Contract is not a purchase contract because it does not provide a guarantee of savings to

retail end use customers as required by the SNG Act's definition of "purchase contract."

*See* I.C. § 4-4-11.6-7.

A. *Common Law Contract*

According to to the SNG Act's definition of "purchase contract," a purchase contract must, first and foremost, be a contract. *See* I.C. § 4-4-11.6-7 (stating "'purchase contract' means a *contract* that . . . .") (emphasis added). The existence of a contract is a question of law, and the basic requirements of a contract are offer, acceptance, consideration, and a "meeting of the minds of the contracting parties." *MH Equity Managing Member, LLC v. Sands,* 938 N.E.2d 750, 757 (Ind. Ct. App. 2010), *trans. denied* (quoting *Batchelor v. Batchelor,* 853 N.E.2d 162, 165 (Ind. Ct. App. 2006)). A valid and enforceable contract must also be reasonably definite and certain in its material terms so that the intention of the parties may be ascertained. *Conwell v. Gray Loon Outdoor Marketing Group, Inc.,* 906 N.E.2d 805, 813 (Ind. 2009). This court cannot make a contract for the parties; nor are we at liberty to revise a contract or supply omitted terms while professing to construe it. *Zuckerman v. Montgomery,* 945 N.E.2d 813, 819 (Ind. Ct. App. 2011).

The Utilities first argue that the Contract is missing material terms because it does not include IG's Subordination and Intercreditor Agreement (Subordination Agreement) with the DOE, which will clarify IG's financing obligations to the DOE. One of the key mechanisms through which IG can satisfy the "Guaranty Savings Amount" under the Contract is a sale of the Plant after the 30-year contract term. However, section 2.6(d) of

26

the Contract provides that the IFA may not sell the Plant without the DOE's consent, "as provided in the Subordination Agreement between IG and the DOE." (Industrial Group's App. p. 320). Likewise, section 2.8 of the Contract provides that if there are any amounts outstanding under the DOE's financing agreement with IG, the IFA's mortgage on the Plant will be subordinated to the DOE's mortgage. (Industrial Group's App. pp. 321-22). The Subordination Agreement is therefore relevant to the Contract but has not yet been negotiated.

In determining whether terms of a contract are essential, "[a]ll that is required is reasonable certainty in the terms and conditions of the promises made, including by whom and to whom." *McLinden v. Coco,* 765 N.E.2d 606, 613 (Ind. Ct. App. 2002) (quoting *Johnson v. Sprague,* 614 N.E.2d 585, 588 (Ind. Ct. App. 1993)). In the end, the contract must "provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Id.*

The Subordination Agreement is relevant to the Contract, but we conclude that it is not an essential part of the Contract. Instead, we find that the Contract is complete without the Subordination Agreement. As required by the common law standard for a contract, it is clear who the parties to the Contract are, what promises they have made and to whom, the basis for determining the existence of a breach, and appropriate remedies. Although the mortgage for the Plant is collateral for the promises made under the Contract, it is not necessary for us to know the terms of the Subordination Agreement to know that IG is obligated to pay the IFA the Contract Savings Guaranty Amount,

27

regardless of whether the Contract identifies sufficient collateral. This conclusion should not be construed to read that the Subordination Agreement is not material to the issues presented in this case. The Agreement is material, but its materiality relates to whether the Contract has fulfilled the "guaranteed savings" requirement under the SNG Act, not to whether the Contract is a legally binding contract under our common law.

In addition, we do not find that the term "retail end use customer" is a "missing" term simply because the parties disagree with its definition. The Utilities' issue with the term "retail end use customer" is not that the parties have omitted it or that it is ambiguous, but merely that the Contract's definition deviates from the statute's definition and that the scope of the term therefore needs to be negotiated. This argument relates to the interpretation of the Contract, not its completeness. By extension, if we find that the definition does in fact inappropriately deviate from the statute, that finding is relevant to whether the Commission exceeded its jurisdiction under the Act, but is not relevant to our determination of whether the Contract is legally enforceable under our common law. In order to determine that the Contract is legally enforceable, we need only find that the Contract contains its essential terms. This contract does contain the term "retail end use customer," and its definition is clear on its face, notwithstanding the issue of whether it conforms to the SNG Act.

Moreover, we are not persuaded that the term "retail end use customer" is essential. Its inclusion clarifies from whom the IFA will receive the proceeds necessary to pay for the SNG but does not alter the IFA's obligation to pay. No matter how many

28

entities qualify as retail end use customers, and will therefore receive pass-through charges under the Contract, the IFA must still pay the full price for the SNG. The terms of the Contract are clear to us without identifying the entities qualifying as retail end use customers.

Finally, we also find that there was a meeting of minds concerning the terms in the Contract. It is clear from the record that the parties to the Contract—the IFA and IG—have the same understanding of the Contract and its implications. It is merely the parties to this appeal that do not have a meeting of minds with respect to the definition of the terms. It would be ludicrous for us to hold that in order for a contract to be binding and enforceable, parties outside of the contract must have the same interpretation of the contract as the parties to the contract. We therefore find that the Contract meets the common law definition of an enforceable contract.

## B. *Finality*

In a related argument, the Utilities assert that because the Subordination Agreement, the UMAs, and the scope of the term "retail end use customer" have not been negotiated or clarified, the Contract is not final as required by I.C. § 4-4-11.6-14(b). It is a well-settled rule that "a formal written contract, which seems to be complete, will be presumed to be the repository of the final intentions of the parties, in regard to the subject-matter of the agreement . . . ." *Straub v. Terre Haute & L.R. Co.,* 35 N.E. 504, 506 (Ind. 1893). We have already found that the Contract is not missing any essential terms, so based on *Straub,* we similarly conclude that it is final.

29

This finding is consistent with our determination that the SNG Act contemplates that SNG production and delivery will require many independent contracts, rather than one ultimate purchase contract. Because the Legislature addressed purchase contracts and the UMAs in different provisions of the SNG Act, we conclude that the Contract may be final even if related contracts such as the Subordination Agreement or the UMAs have not yet been negotiated.

## C. *Savings Guarantee*

Finally, the Utilities argue that the Commission exceeded its jurisdiction when it approved the Contract because the Contract failed to provide a guarantee of savings to retail end use customers. *See* I.C. § 4-4-11.6-7. We disagree.[8]

The Utilities' primary contention is that the Contract's "Contract Savings Guaranty" provision is illusory because even though it guarantees that the retail end use customers will save $100 million under the Contract, the collateral for that promise is insufficient. Pursuant to the Contract, there are three different mechanisms by which IG may fulfill its $100 million guarantee: (1) it may pay any shortfall in cash; (2) extend the Contract at a lower SNG price; or (3) allow the IFA to sell the Plant. The Utilities argue that the first mechanism is insufficient because it assumes the Plant will be profitable and that IG will have the funds to pay cash at the end of the Contract term. Likewise,

_____

[8] The IFA, IG, and Lincolnland ask us to find that the Utilities have waived this argument by failing to raise it before the Commission. We decline to do so because it is clear from the record that the issue of whether the Contract provides a guarantee of savings was raised and extensively argued before the Commission.

extending the Contract up to an additional twenty years also assumes that the Plant will be profitable and that such an extension will provide an opportunity for the IFA to make up the shortfall. As to the third mechanism, the Utilities note that the Contract specifies that the IFA may not receive proceeds from a forced sale of the Plant until the provisions of the Subordination Agreement have been met. They claim that all of the proceeds from such a sale might go to repay the $1.875 billion in financing from the DOE, rather than the IFA. Alternatively, even if the IFA is eligible to receive proceeds from the sale of the Plant, the Utilities assert that there is no assurance the Plant will be worth enough to cover the savings shortfall.

As a subsidiary issue, the Utilities and the Citizens Groups also argue that the Contract does not guarantee savings to retail end use customers because the collateral listed in the Contract may not be realized until after the primary term. They argue that when it enacted the SNG Act, the Legislature intended guaranteed savings to be provided to retail end use customers *throughout* the term of a purchase contract, rather than at the end of the contract's term. The Utilities support this argument by noting that the SNG Act specifies that a purchase contract is a contract that "provides" rather than "will provide" a guarantee of savings. *See* I.C. § 4-4-11.6-7.

The SNG Act does not explicitly clarify whether a purchase contract guarantee of savings must include evidence of collateral supporting the guarantee or whether the guarantee must specify that retail end use customers will realize savings *throughout* the primary term of a purchase contract. Accordingly, we will first interpret the Legislature's

intention in providing for a "guarantee" of savings in the SNG Act, and then we will interpret the Contract to decide whether the Contract complies with our interpretation of the Legislature's intent.

A. *Interpretation of the SNG Act*

Our primary issue is the Legislature's meaning in its usage of the word "guarantee." According to the Utilities, "guarantee" means that retail end use customers must realize savings and the Contract must therefore specify that there will be sufficient collateral to ensure such savings. In response, the IFA, IG, Lincolnland, and the OUCC contend that the Contract must merely provide an assurance—which they interpret as a "promise"—of savings. According to the OUCC, "[the Utilities' arguments] confuse the actual guarantee of savings itself with the forms of collateral backing the guarantee that exists in the Contract." (the OUCC's Br. p. 25). In light of the plain language of the SNG Act, we agree with the IFA, IG, Lincolnland and the OUCC.

As stated previously, the first step in any statutory interpretation is determining if the Legislature has spoken clearly and unambiguously on the point in question. *Thatcher,* 962 N.E.2d at 1227. If a statute is clear and unambiguous on its face, no room exists for judicial construction. *Id.* However, when the language is susceptible to more than one interpretation, it is deemed ambiguous and thus open to judicial interpretation. *Id.* When construing a statute, the Legislature's definition of words is binding upon this court. *Wolfe,* 735 N.E.2d at 1191. If the Legislature has not defined a word used in a statute, we will give the word its "plain, ordinary, and usual meaning." *Planned*

32

*Parenthood of Ind.,* 854 N.E.2d at 866. We must give every word effect and meaning, and we will not hold any part of the statute meaningless if it can be reconciled with the rest of the statute. *Lex, Inc.,* 808 N.E.2d at 109.

Black's Law Dictionary defines "guarantee" as "[t]he assurance that a contract or legal act will be duly carried out." BLACK'S LAW DICTIONARY 723 (8th ed. 2004). Black's further defines "assurance" as "[s]omething that gives confidence; the state of being confident or secure." BLACK'S LAW DICTIONARY 135 (8th ed. 2004). This definition is akin to a "promise" that the contract will be carried out, rather than a requirement for security or collateral. In other words, IG was only required to promise that retail end use customers will realize savings throughout the term; it was not required to provide proof of collateral to ensure fulfillment of that promise.

Turning to the issue of whether the Legislature intended a purchase contract to guarantee savings *throughout* the purchase contract's term, we reject the Utilities' analysis of the verb tense used in I.C. § 4-4-11.6-7. The SNG Act defines a purchase contract as a contract that: "provides a guarantee of savings for retail end use customers." I.C. § 4-4-11.6-7. The Utilities point to the verb "provides" and argue that because it is present tense, as opposed to the future tense "will provide," the Legislature intended savings to be realized throughout the contract's term. However, we conclude that "provides" modifies the word "guarantee" rather than "savings." Thus, although it is clear that the Legislature intended a purchase contract to provide a guarantee during the

33

term of a purchase contract, it is not clear whether the Legislature intended retail end use customers to realize savings during the same term.

As the remainder of the SNG Act is silent with respect to when retail end use customers must realize guaranteed savings, and this is a critical issue to our analysis, we will engage in judicial construction in order to determine the Legislature's intent. In the SNG Act, the Legislature expressly indicated that one of its primary goals was that gas prices should be reasonable as a result of an SNG purchase contract. In particular, the Legislature found that "[t]he furnishing of reliable supplies of *reasonably priced* natural gas for sales to retail customers is essential for the well being of the people of Indiana" and "obtaining low cost financing for the construction of new coal gasification facilities is necessary to allow retail end use customers to enjoy the benefits of a reliable, *reasonably priced*, and long term energy supply." I.C. § 4-4-11.6-12 (emphasis added). The Legislature also implied that one impetus for encouraging SNG production contracts was to mitigate price volatility because "[n]atural gas prices are volatile, and energy utilities have been unable to mitigate completely the effects of the volatility." *See* I.C. § 4-4-11.6-12.

Based on these expressed goals, we interpret the SNG Act in a manner consistent with ensuring that SNG prices will be reasonable and will mitigate the otherwise volatile nature of the natural gas market. *See Wolfe,* 735 N.E.2d at 1191 ("[W]e presume the Legislature intended its language to be applied in a logical manner consistent with the statute's underlying policy and goals."). Therefore, we find that the Legislature intended

retail end use customers to be guaranteed savings throughout the term of an SNG purchase contract. If we were to decide that a purchase contract could merely guarantee savings after its primary term, it is possible that retail end use customers could endure substantial losses for thirty years or more before finally realizing savings in the form of one lump sum. Such a result would be contrary to our Legislature's goal of providing energy at reasonable prices and mitigating the volatile natural gas market.

### B. *Contract Interpretation*

Mindful of our interpretation of the SNG Act, we now turn to the Contract to determine whether it conforms to our construction of the Legislature's intended meaning when it provided for a "guaranteed savings to retail end use customers." We conclude that it does.

Under the terms of the Contract, it is clear that IG made a promise that retail end use customers will realize savings throughout the Contract's primary term. Section 2.5 of the Contract provides that "[o]ver the course of the Primary Term, [IG] guarantees that [the IFA] will realize the Contract Savings Guaranty Amount." (Industrial Group's App. p. 157). The Contract then defines "Contract Savings Guaranty Amount" as:

> the aggregate savings guaranteed by [IG] to [the IFA] under [the Contract], which is equal to One Hundred Million Dollars ($100,000,000) in real 2008 dollars, from [the IFA's] purchase of [c]onforming SNG pursuant to [the Contract] over the Primary Term and any Shortfall Term . . .

(Industrial Group's App. p. 207). This provision promises that there will be savings in the amount of $100 million and that the savings will be realized "over the course of the [p]rimary [t]erm." (Industrial Group's App. p. 207). Thus, we conclude that the Contract

35

contains IG's promise to provide savings to retail end use customers and its promise that the savings would be realized throughout the primary term of the Contract. Accordingly, we conclude that the Commission did not exceed its statutory jurisdiction when it approved the Contract.[9]

## II. *Retail End Use Customer*

The petition filed by the IFA and IG requested Commission approval of the Contract that the two parties had entered into. The petition also requested Commission approval, if necessary, requiring Indiana regulated energy utilities to enter into a UMA with the IFA.

However, in the November 22, 2011 Order, the Commission did not make any ruling on the merits of the issue raised concerning the definition of "retail end use customers." The Commission approved the SNG Contract but declined to address the merits of the proposed UMAs.

While the Commission did not address the issue raised of the meaning of "retail end use customers," the Contract's terms deviates from the SNG Act's definition. Accordingly, we will address whether the Contract's term "retail end use customers" inappropriately deviated from the SNG Act's definition.

The SNG Act defines "retail end use customer" as:

a customer who acquires energy at retail for the customer's own consumption: (1) from a gas utility that must apply to the [C]ommission

---

[9] Because we have concluded that IG was not required to prove that its collateral was sufficient to support its guarantee, we will not further address whether the Contract appropriately limited the Plant's $CO_2$ costs.

under [I.C. §] 8-1-2-42 for approval of gas cost changes; or (2) under a program approved by the [C]ommission through which the customer purchases gas that would be subject to price adjustments under [I.C. §] 8-1-2-42 if the gas were sold by a gas utility.

I.C. § 4-4-11.6-10.   None of the parties argue that industrial transportation customers acquire energy at retail from gas utilities, as would satisfy the first prong of the definition, so the only issue we must consider is whether industrial transportation customers receive energy under a program approved by the Commission through which they purchase gas that would be subject to price adjustments under I.C. § 8-1-2-41 if the gas were sold by a gas utility.

Industrial practice distinguishes between two types of natural gas consumers: "industrial transportation" customers and "sales" customers.  It equates "sales" customers with retail end use customers falling under the first prong of the SNG Act's definition.  "Sales" customers purchase a full-service product from gas utilities.   Under this arrangement, the gas utility is responsible for purchasing the gas, nominating and scheduling the deliveries of the gas, addressing imbalances, and hedging the purchase price of the commodity for the "sales" customer.  In contrast, "industrial transportation" customers hold full responsibility for purchasing the gas as well as nominating and scheduling the deliveries of gas.  They are responsible for any imbalances between the quantities nominated and scheduled for receipt and delivery and actual quantities received and delivered on both the interstate and gas utility systems.  Interstate pipelines and gas utilities generally have no obligation to provide gas to the gas utilities' city-gate, or if there is a failure of the supply upstream, to deliver the gas to transportation

37

customers. In effect, the gas utility is simply a transporter of the transportation customer's gas.

Likewise, there is also a difference in the way that transportation customers and sales customers are charged. Sales customers are billed in a separate charge by the gas utility, referred to as a Gas Cost Adjustment (GCA) charge, which is a weighted average rate applicable to all gas utility retail customers. Transportation customers pay their suppliers for the cost of natural gas based on individual negotiations between the transporter and gas supplier. Charges to the transportation customer are based on a number of factors, including a market-based commodity only charge, a charge with both a commodity and a reservation charge, and a charge reflecting both gas costs and transportation costs to the gas utility if the gas supplier provides delivery service into the gas utility on behalf of the transportation customer. Transportation customers then pay gas utilities for transportation services according to tariffs approved by the Commission under I.C. § 8-1-2-87.7.

Based on these differences between sales customers and industrial transportation customers, we conclude that the Legislature did not intend to include transportation customers within the definition of "retail end use customer." First, transportation customers do not purchase energy through a program approved by the Commission. Although transportation customers pay gas utilities for transportation services based on a tariff system approved by the Commission, the gas utility tariffs do not require the Commission to examine and approve the commodity purchase contracts between the

38

transportation customers and the third-party marketers and suppliers. *See* I.C. § 8-1-2-87.7. Second, the transportation customers do not necessarily purchase energy that would be subject to price adjustments under I.C. § 8-1-2-42 if the gas were sold by a gas utility. The price adjustments governed by I.C. § 8-1-2-42 are public utility rate schedules. *See* I.C. § 8-1-2-42. Because transportation customers purchase energy on the open market, the price is not governed by rate schedules. Martin J. Marz (Marz), an energy advisor, testified that transportation customers will pay their suppliers for the cost of natural gas based on individual negotiations. The charge may be calculated in a variety of ways. As stated above, the charge could be a market-based commodity only charge, a charge with both a commodity and a reservation, or a charge reflecting both gas and transportation costs. Accordingly, the energy that transportation customers purchase would not necessarily be subject to price adjustments if the gas were sold by a gas utility.

Instead, the second prong of the definition of "retail end use customer" more appropriately applies to energy customers such as those that purchase energy through programs approved by the Commission under the Alternative Utility Regulation Act. *See* I.C. § 8-1-2.5-1. One such example is the Northern Indiana Public Service Company's (NIPSCO) customer choice tariff. Marz testified that users of this program may choose to obtain its gas from a NIPSCO pre-approved list of gas suppliers. Once the customer has chosen a preferred supplier, however, the customer is not responsible for nominating and scheduling deliveries or for any balancing-related charges or penalties. In this respect, a customer under this program fits the mold of a traditional "sales" customer.

39

In light of this distinction, we conclude that the Legislature did not intend industrial transportation customers, who utilize gas utilities only for their transportation services, to be subject to the SNG Act as retail end use customers. Thus, we find that the Contract's definition of "retail end use customer" deviated from the statutory definition. We reverse the Commission's regulatory approval of the Contract.

CONCLUSION

Based on the foregoing, we conclude that (1) the Utilities and the Industrial Group's claims are justiciable; (2) the Commission did not exceed its jurisdiction when it approved the Contract; and (3) the Contract's definition of retail end use customer inappropriately included industrial transportation customers, even though the Legislature did not intend industrial transportation customers to be subject to the SNG Act as retail end use customers. We reverse the Commission's order approving the Contract.

Reversed.

DARDEN, S. J. concurs

ROBB, C. J. concurs in part and dissents in part with separate opinion

# IN THE
# COURT OF APPEALS OF INDIANA

INDIANA GAS COMPANY, INC, and )
SOUTHERN INDIANA GAS AND )
ELECTRIC COMPANY, *et al*,. )
)
    Appellants-Respondents, )
)
      vs. )    No. 93A02-1112-EX-1141
)
INDIANA FINANCE AUTHORITY and )
INDIANA GASIFICATION, LLC, )
)
    Appellees-Respondents. )

**ROBB, Chief Judge, concurring in part, dissenting in part**

       I concur in all but the final disposition of the well-considered opinion of the majority in this case. The majority reverses the Commission's regulatory approval of the Contract because the definition of "retail end use customer" in the Contract deviates from the statutory definition. I do not believe reversal of the Commission's approval of the Contract in its entirety is necessary.

The Commission has the authority to approve a final purchase contract so far as the contract comports with the statutory requirements of the SNG Act. <u>See</u> Ind. Code § 4-4-11.6-14. As noted by the

41

majority, the Contract at issue does comport with the statute but for the provision which includes transportation customers within the Contract's definition of retail end use customers. It is this inclusion which renders the Contract definition of "retail end use customers" incompatible with the statutory definition.

As a general proposition, a contract made in violation of a statute is void and unenforceable. Jaehnen v. Booker, 806 N.E.2d 31, 36 (Ind. Ct. App. 2004), trans. denied. However, if a contract contains an unauthorized provision that can be eliminated without frustrating the basic purpose of the contract, the remainder of the contract may be enforced. Harbour v. Arelco, Inc., 678 N.E.2d 381, 385 (Ind. 1997) (holding that if remainder of car rental contract had conformed with statutory requirements, the inclusion of a provision for recovery of attorney fees not authorized by statute would not have rendered entire contract invalid because the primary purpose of the contract would not be frustrated by eliminating that provision). Because the transportation customers are an easily identifiable group, I believe we could merely exclude that part of the Contract which includes transportation customers in the definition of retail end use customers without frustrating the primary purpose of the Contract. Accordingly, I would hold, with the exclusion of that part of the Contract definition of retail end use customers which applies to transportation customers, that the Contract was properly approved by the Commission.